*In re* PAQUIN'S ESTATE.

1. Witnesses—Will Contest.

   Neither the nonrelated proponent, contestants nor witness who expected proponent to see that witness and her family obtained certain of 88-year-old decedent's property were disinterested witnesses in will contest.

2. Wills—Mental Competency—Undue Influence.

   Questions of mental competency and undue influence were properly submitted to jury in will contest under conflicting evidence produced.

3. Same—Disposition Other Than in Case of Intestacy.

   An aged person who is competent and not unduly influenced to make a will has a right to make a will providing for a disposition of his property different from that provided for by law in case of intestacy.

4. Same—Mental Competency—Guardianship.

   The fact that a guardian was appointed because of testator's age and physical infirmities does not of itself necessarily imply incompetency to make a will.

5. Same—Weakness of Mind—Forgetfulness—Mental Competency.

   Weakness of mind and forgetfulness are insufficient to invalidate a will if it appears that the mind of the testator was

---

References for Points in Headnotes

[1] 58 Am Jur, Witnesses, §§ 866, 867.
[2, 6, 7, 10, 11] 57 Am Jur, Wills, §§ 146, 451.
[3, 4] 57 Am Jur, Wills, § 70.
[5–7] 57 Am Jur, Wills, §§ 73, 78.
[7] 57 Am Jur, Wills, § 63 *et seq.*
[8] 57 Am Jur, Wills, § 435.
[9] 57 Am Jur, Wills, § 927.
[11] 57 Am Jur, Wills, § 928.
[12] 57 Am Jur, Wills, §§ 50–52.
[13] 3 Am Jur, Appeal and Error, § 344 *et seq.*

capable of attention and exertion when aroused and he was
not imposed upon.

6. SAME—MENTAL COMPETENCY—OBJECTS OF BOUNTY.

Instances of forgetfulness, habits of untidiness, and physical
impairment may be insufficient to take to jury question of
testator's mental competency if there is a failure to show
he had lost capacity of knowing what property he had or
who were objects of his bounty.

7. SAME — MENTAL COMPETENCY — UNDUE INFLUENCE — EVIDENCE
—QUESTION FOR JURY.

Testimony on behalf of contestants that 88-year-old decedent
had been enuretic, that he talked aloud to relatives who
had been dead for years, engaged in childish pastimes, that
he was unable to see or keep track of his affairs, that be-
fore will was drawn an attorney had refused to draw a deed
for him because of mental incompetency and that his mental
condition had deteriorated since then, was sufficient, when
taken with positive testimony of incompetence and undue
influence, to take question of mental competency to jury.

8. SAME—UNDUE INFLUENCE—INFERENCES.

Undue influence upon a testator may be insidious and not in
front of witnesses, but fair inferences can be drawn from
the facts.

9. SAME—CREDIBILITY OF WITNESSES.

Credibility of witnesses is always a matter for the jury who
may not accept all or any part of testimony that they be-
lieve untrue, especially where there is conflicting testimony
by interested witnesses in a will contest.

10. SAME—QUESTION FOR JURY—MENTAL COMPETENCY—UNDUE IN-
FLUENCE.

A question for the jury is presented in a will contest when
there is testimony showing incompetence to make a valid
will or undue influence has been exerted on the testator.

11. SAME—DIRECTED VERDICT—UNDUE INFLUENCE—MENTAL COM-
PETENCY.

Motion for directed verdict for proponent in will contest was
properly denied, where, under record viewed in light most
favorable to contestants, there was sufficient evidence to
submit questions of undue influence and mental incompe-
tency to the jury.

12. SAME—INSTRUCTIONS.
      Charge to jury in will contest between proponent, a nonrela-
      tive, and contestants, testator's nieces and nephews, when
      taken as a whole, *held*, fair, where it called upon jury to
      determine true facts and do justice and stated that testa-
      tor's blood relatives had no natural or inherent right to his
      property.

13. APPEAL AND ERROR—WITNESSES—ADMISSION OF UNCHASTITY.
      Admission of a lack of chastity by proponent's witness in cross-
      examination in will contest, which was objected to but per-
      mitted to stand, was not reversible error in absence of mo-
      tion to strike and no reason given for objection.

Appeal from Cheboygan; Waller (Ward I.), J.
Submitted June 9, 1950. (Docket No. 58, Calendar
No. 44,788.) Decided September 11, 1950. Rehear-
ing denied December 5, 1950.

In the matter of the estate of Ferdinand Paquin,
deceased. Ferris L. Coffman presented the last will
and testament of Ferdinand Paquin for probate.
Harold J. Paquin and others objected thereto. Con-
test certified to circuit court. Verdict and judgment
for contestants. Proponent appeals. Affirmed.

*Shepherd, Berry & Berry,* for proponent.

*John A. Cain* and *John S. Clark,* for contestants.

BUTZEL, J. Ferdinand Paquin of Mackinaw City
died on January 13, 1949, leaving an instrument pur-
porting to be his last will and testament. It was
dated July 10, 1944, 3 weeks prior to his eighty-
eighth birthday. It contained a bequest of $500 to
the Altar Society of St. Mary's Roman Catholic
Church of Mackinaw City, Michigan. The attorney
who drafted the will testified that this was a mis-
nomer and an error, that St. Anthony's Roman
Catholic Church was meant. The entire residue of
the estate, valued at between $25,000 to $30,000 was

left to Ferris L. Coffman, proponent, who filed a petition to probate the will in the probate court for the county of Cheboygan, Michigan. Nine nieces and nephews appeared as contestants and claimed that at the time the instrument was purportedly executed, decedent lacked mental competency or capacity to make a valid will; that the instrument did not represent the will or desires of decedent but was induced by fraud and undue influence and also by coercion. On issues being framed in the probate court, the case was certified to the circuit court for the county of Cheboygan where, after trial by jury, the contestants prevailed. The jury in answer to 2 special questions found that the will was the result of undue influence and that Paquin had not the mental competency to make a will.

Paquin when a young man lost his left leg above the knee in a railroad switching accident. He lived at the Frederick Hotel, owned by him, in Mackinaw City. It was run by Mr. and Mrs. Nelligan and their daughter Dorothy. The latter testified that they received a monthly sum from Paquin for his board, and in addition, retained a large part, if not all, of the receipts from the hotel. They made the repairs. Nelligan died prior to the trial. His daughter denied important testimony given by Paquin's nieces showing mental incompetency but she admitted that under Paquin's orders she always remained present when anyone called on him. She also admitted that she expected that the will would contain a provision leaving the Nelligans the Frederick Hotel and she believed that Coffman would see that they got it. Neither she nor Coffman nor the contestants who testified were disinterested witnesses. The interest of others in upholding the will may have been considered by the jury.

Coffman ran a tavern known as the Dixie Bar in a building in Mackinaw City which he had rented

from Paquin for many years. He was in no way related to him. He claimed that Paquin had known him for years and had thought highly of him because he paid his rent promptly and had also paid the cost of the maintenance of the building without asking Paquin to reimburse him. He stated that Paquin had assured him that he would see to it that he was paid for such expenditures. He testified that Paquin first approached him with the request that he act for him.

Mr. Berry of Cheboygan, Michigan, who drew the will, had been Coffman's attorney and had acted for him in several matters, including a lawsuit with Paquin years ago. According to Coffman's testimony he first contacted Mr. Berry in regard to drafting a power of attorney from Paquin and subsequently on July 7, 1944, he brought Paquin from Mackinaw City to Berry's office in Cheboygan. It is claimed that Paquin then gave directions for the preparation of a power of attorney running to Coffman but did not mention a will. Contestants claim that at that time Paquin was not only lame, blind and very hard of hearing, but also mentally incompetent. On July 10, 1944, Coffman and Nelligan brought Paquin to the Berry office in Cheboygan. They assisted him up the stairs. Paquin then executed the power of attorney which had been prepared. It contained a clause which provided that by reason of business dealings between Paquin and Coffman the power of attorney was one connected with an interest insofar as the management of Paquin's estate was concerned and that in the event of Paquin's death Coffman should be considered an agent or attorney in fact with an interest and with the authority to carry on the powers granted until proper appointment for Paquin's estate was made by the probate court or other court of competent jurisdiction.

Coffman testified that the business dealings referred to in the power of attorney consisted solely of paying the rent promptly and not bothering Paquin for repairs and maintenance. Coffman testified that he did not know that a will in his favor was to be drawn when the power of attorney was drawn notwithstanding the clause in the power of attorney that it should continue subsequent to Paquin's death until proper appointment was made by the probate court.

Coffman testified that after the power of attorney was executed he left the law office as he had a small order of liquor for the Dixie Bar which he wanted to pick up downstairs. How long it would take to pick up the small order and place it in his car, the record does not show. Mr. Berry testified that during Coffman's absence Paquin gave directions for the drafting of a will. He testified that he asked Paquin who his relatives were and that he replied that he had no brothers or sisters but did have some cousins and nieces and nephews; that it was suggested to him that he leave each a small bequest but that Paquin stated that he did not want to leave them anything. The stenographer who drew the will corroborated this testimony. However, she also stated that she was not present when Paquin and the attorney discussed the will prior to its being dictated to her but she was present when it was read to Paquin. Eight days later Paquin again came to Cheboygan from his home in Mackinaw City and signed a petition previously prepared by Mr. Berry. Paquin did not go up to the Berry office, but signed the petition in the probate judge's office before the judge. It was addressed to the probate court and stated that Paquin because of his age and physical infirmities and the impairment of sight desired to have Coffman appointed guardian of his person and estate, that Paquin had given Coffman a power of

attorney; that Paquin had no near or direct relatives or next of kin. There is no testimony to show that Paquin had previously asked for the appointment of a guardian. Coffman testified that he sought the guardianship so as to obtain certain papers, et cetera, belonging to Paquin. The petition was presented to the Honorable Oswald T. McGinn, judge of probate, whose testimony we shall hereafter refer to. He knew of Paquin's condition from previous experience and immediately granted the petition. He fixed Coffman's bond at $10,000 and subsequently, for reasons not shown in the record, raised it to $20,000. Since the petition stated that Paquin had no next of kin, they were not given notice of the filing of the petition, to which they were legally entitled. Both the attorney and his stenographer gave testimony which would tend to uphold the will drawn by them. The attorney testified that Paquin was alone with him in the office, that he was able to discuss various matters in general and could hear the will read and that he signed it unassisted; that Paquin's vision was impaired but nevertheless he could see and understand what he was doing. Testimony shows that 8 days later when Paquin signed the petition for appointment of a guardian, Paquin's hand had to be guided to the place for signature. Coffman also testified that Paquin was mentally competent and able to see although his vision and hearing were impaired. Miss Nelligan also testified along similar lines but she testified that Paquin had frequently stated that he wanted her mother to have the Frederick Hotel for taking care of him and she thought that if it was within Mr. Coffman's power he would see to it that this wish was carried out. She testified that Paquin could hear the radio, listened to it frequently and was particularly interested in the war news and discussed it with the

Nelligans. The testimony of other witnesses for proponent is relatively of little importance.

In August, 1944, and but a short time after Coffman was appointed guardian, he employed a doctor, who was also a psychiatrist, to examine Paquin and determine his physical and mental condition. The doctor summered at Mackinaw City. He examined Paquin also during a number of succeeding summers. He testified in no uncertain terms that Paquin was mentally competent. He, however, stated that he received a part of his information from one of the Nelligans, whose interest in sustaining the will we have referred to. Coffman admitted that in 1925 he was convicted of grand larceny and served a sentence at Ionia and also that he had a permit to carry a concealed weapon at the time of the trial and for a number of years prior thereto. He denied that he had ever been arrested or convicted of any crime except in this one instance but later admitted his arrest on a robbery charge in 1926 and shortly thereafter for another felony. We do not regard these old charges of much importance. It must, however, have looked suspicious to the jury that Coffman employed a psychiatrist but shortly after the will was drawn. Coffman positively testified that he did not know of the will until several months after it was executed. His account in the probate court showed that he made 2 payments of $50 each in July, 1944, to the attorney who drew the power of attorney, will and guardianship papers. In his testimony he stated that he thought the attorney did some other work for Paquin. The attorney's invoices were not produced. When finally asked if he did not know about the will when he employed the doctor to examine Paquin in August, 1944, Coffman replied, "I don't remember." When asked whether at that time he knew the contents of the will at that time, he stated, "I don't recall."

Two nieces testified that they called to see Paquin. One of them testified she could never see him alone and stated that Miss Nelligan had told them that Paquin's mind was all gone; that he was enuretic, and that one time the niece called when Paquin was in his bedroom and she was told by Miss Nelligan not to go into the bedroom because on a previous occasion she had found Paquin exposed and engaged in infantile regression. The niece also testified that one time when she called on Paquin he was talking out loud and seemed to be engaged in a game adapted to the mental level of one less than 2 years old. Each testified that although they had taken Paquin years ago to the funerals of 2 of his brothers, he subsequently asked each how the respective brothers were getting along and did not seem to realize that they had been dead for many years. If he did not realize that they were dead, it would indicate that he did not know who his next of kin were. One testified that one time when she visited Paquin, he was talking to her father, who had been dead some 11 years. Other testimony indicated that senility had advanced so far that Paquin was no longer competent to make a will. A very prominent citizen of Mackinaw City who out of kindness had assisted Paquin in his business affairs for a long time testified that Paquin was unable to see, or to keep track of his affairs, and was completely incompetent. No records were kept. Judge McGinn testified that in 1940, shortly before he went on the bench, Paquin in company with Mr. Nelligan had come to his law office and asked him to draw a deed for the Frederick Hotel to Nelligan. Judge McGinn discussed the matter with Paquin and came to the conclusion that Paquin did not know what he was doing, and, therefore, he refused to draw the deed. He stated that he did not believe that Paquin was competent in 1940; that it was obvious that his mental condition

had deteriorated since then, and for this reason when Paquin petitioned for a guardian he took no testimony but immediately granted the petition.

The jury was unquestionably impressed by the testimony of a Catholic priest whose church Paquin had formerly attended. In 1942 or 1943, the priest stated that Paquin was no longer able to grasp what was going on, and that prior to the time that he stopped going to church he would create a disturbance in the church by biting his knuckles and fingers and making faces and contortions; that he acted childish, was deaf and blind and was apparently helpless, and could not carry on a conversation; that he was mentally incompetent on July 10, 1944. There is other testimony showing incompetency, but we do not believe it necessary to detail it. We can summarize it by saying that there was more than sufficient testimony to submit the questions of mental incompetency and undue influence to the jury who found in favor of contestants.

Proponent on appeal has asked us to determine whether there was sufficient evidence when considered in the light more favorable to contestants to warrant submission of the questions raised to the jury, in view of the law of this State. Courts have steadfastly upheld the right of an aged person who is competent and not unduly influenced to make a will, even though it makes disposition different from that provided by the law in case of intestacy. The fact that a guardian was appointed because of testator's age and physical infirmities does not of itself necessarily imply incompetency to make a will. *In re Vallender's Estate,* 310 Mich 359. Weakness of mind and forgetfulness are insufficient to invalidate a will if it appears that the mind of the testator was capable of attention and exertion when aroused and he was not imposed upon. *In re Cotcher's Estate,* 274 Mich 154. Instances of forgetfulness, habits of

untidiness, and physical impairment were held insufficient to take to the jury the question of the testator's lack of mental capacity if there was a failure to show that he had lost capacity of knowing what property he had or who were the objects of his bounty. *In re Grow's Estate,* 299 Mich 133. Many more cases can be cited to like effect although the facts differ from those in the instant case. Some of the facts that we have detailed without other circumstances would not show mental incompetence but a jury question arises when we take them altogether, together with positive testimony that testator was incompetent and was unduly influenced. Undue influence may be insidious and not in front of witnesses, but fair inferences can be drawn from the facts. The question of credibility is always one for the jury who may not accept all or any part of testimony that they believe untrue. Credibility is a very important factor where facts are in conflict and witnesses have an interest in upholding or defeating a will.

We have held that a question for the jury exists when there is testimony showing incompetence to make a valid will or undue influence exerted on the testator. *In re Rockett's Estate,* 191 Mich 499, 506, facts again differ but the Court stated the correct principle of law, as follows:

"Much evidence was introduced on both sides of this question, which it would be unprofitable to examine. It is, we think, clear that sufficient evidence was introduced by the contestant bearing upon the question of the mental capacity of the testatrix to warrant the court in taking the verdict of the jury upon that question, and we are unable to say that the denial of a new trial on the ground that the verdict was against the weight of evidence was such an abuse of discretion as would warrant a reversal in this Court upon that ground."

Also, see, *In re Rosa's Estate*, 210 Mich 628; *In re Slepski's Estate*, 253 Mich 340; *In re Guthrie's Estate*, 257 Mich 180. *In re Cummins' Estate*, 271 Mich 215, we said:

"We are constrained to hold there was some evidence to go to the jury on the question of the mental incompetency of testatrix and, therefore, the court was in error in entering judgment contrary to the verdict."

Answering proponent's question involved, as stated in the brief in his behalf, there was sufficient evidence in the record viewed in a light most favorable to contestants to submit the questions of undue influence and mental incompetence to the jury. The court correctly denied the motion to direct a verdict for proponent.

Error is claimed on the ground that the judge confused or misled the jury by stating to them:

"We are not called upon to be sentimental or sympathetic. We are called upon simply to do justice here, and to do justice you determine what the true facts in the case are and apply those facts to the law as the court gives you the law and arrive at your verdict accordingly. There is no sense of obligation on any of you, there is no sense of responsibility in this case on the part of any one of you except to do justice."

The judge had also charged the jury that the testator's blood relatives had no natural or inherent right to his property. The charge, taken as a whole, was a fair one.

A claim of error is made that when Miss Nelligan was cross-examined after she answered a question and admitted a lack of chastity, the attorney for proponent thereupon stated, "I object," and the judge held that "the question and answer are on the record." There was no motion to strike the

testimony; the reasons for the objection were not given; there was no error.

Judgment in favor of contestants and appellees is affirmed, with costs.

BOYLES, C. J., and REID, NORTH, DETHMERS, CARR, BUSHNELL. and SHARPE, JJ., concurred.