334 Mich. 461 (1952)
54 N.W.2d 718
In re KANERA'S ESTATE.
TEN CATE
v.
KANERA.
Docket No. 21, Calendar No. 45,395.
Supreme Court of Michigan.
Decided September 4, 1952.
Miles & Miles, for proponents.
Leo W. Hoffman, for defendants.
SHARPE, J.
This is a proceeding to establish and have admitted to probate the last or destroyed will of James Kanera deceased. The deceased, whose wife died in the early part of 1945, lived in the village of Saugatuck, where he owned 3 cottages. He was childless, but was survived by a younger brother, John Kanera, and 3 sisters, Mary Penshorn, who lives in Chicago, Antoinette Day, who lives in Detroit, and Anna Kanera, who lives in Detroit in the winter and in Allegan county in the summer.
In August, 1945, Rose Sitzler became acquainted with deceased, and at his request she became his housekeeper.
On April 25, 1949, Vernon Ten Cate, an attorney of Holland, Michigan, drafted a will for deceased, and retained an unsigned copy of it. This will was executed in Mr. Ten Cate's office. Deceased took the executed will with him when he left Ten Cate's office.
*464 In the fall of 1949, deceased made arrangements with the Veterans Administration for a physical examination in Detroit. He came to Detroit in November, and stayed 2 days with his sister.
About the middle of November, 1949, Anna Kanera and her nephew drove deceased back to Saugatuck, where they left him in front of his cottage. When deceased left for Detroit, Rose Sitzler left to visit her daughter. When deceased returned to Saugatuck he was taken to Douglas, and later to a hospital in Grand Rapids, where he died December 4, 1949.
On February 16, 1950, proponent, Vernon Ten Cate, executor named in the will, filed a petition in the probate court of Allegan county, alleging possession of a copy of the will, and petitioned to have proofs taken and the instrument admitted to probate as the will of deceased. The will in question reads as follows:
"LAST WILL AND TESTAMENT
"I, JAMES KANERA, of the village of Saugatuck, in the county of Allegan, State of Michigan, being of sound mind and memory, do make, publish and declare this to be my last will and testament, hereby revoking all former wills and codicils by me at any time heretofore made.
"FIRST: I direct the payment of all of my just debts and funeral expenses as soon as possible after my death.
"SECOND: All the rest, residue and remainder of my property, of which I may die seized or possessed, or to which I may in any manner be entitled at the time of my death, I give, devise and bequeath to Vernon D. Ten Cate, of Holland, Michigan, as trustee, for and on behalf of Rose Sitzler, she to have the life use and income from my said estate, and in the fulfillment of the trust powers I hereby grant unto my said trustee the following powers:
"To demand, receive, compromise or adjust any right of action and any right or title hereby conveyed *465 or hereafter acquired by my trustee; to bring or dismiss any action, suit or proceedings and employ counsel; to convert and reconvert, invest and reinvest, sell, exchange, lease, pledge or mortgage the whole or any portion of the property or funds held in trust; to alter, repair, rebuild or improve the buildings on the land now owned by me or hereafter acquired by my trustee; to pay taxes, assessments, insurance premiums and other expenses incident to the execution of the trust, including the compensation of the trustee; to make, sign, sell and deliver such instruments and to perform such other acts as may be required for the fulfillment of this trust, and to exercise any further or other powers necessary or convenient to enable him to perform his duties as such trustee, and such other powers as shall be given him by the laws of the State of Michigan; and I do order and direct that the said trust shall be dissolved upon the death of the said Rose Sitzler and the remainder of said trust fund be paid to the Veterans of Foreign Wars of the United States National Home.
___________________________ (L.S.)
at Eaton Rapids, Michigan.
"THIRD: I hereby nominate and appoint Vernon D. Ten Cate, of Holland, Michigan, executor of this last will and testament, and I confer upon my said executor power and authority to sell, lease or mortgage any and all real and personal estate for such price and on such terms as he may deem best for my estate, and in the execution of the trust hereinabove provided for.
"FOURTH: I will and direct that any Federal or State taxes, either income, inheritance, or estate taxes of any kind or nature, either now imposed or which may after the date hereof be imposed or shall come due, shall be paid from my estate the same as administration expenses.
*466 "IN WITNESS WHEREOF, I have hereunto set my hand and seal and declared this to be my Last Will and Testament this 25th day of April, 1949.
.......................... (L.S.)"
On March 8, 1950, John Kanera filed objections to the granting of the petition as follows:
"That he objects to the granting or allowance of probate to that certain instrument propounded by Vernon D. Ten Cate by petition of Vernon D. Ten Cate dated the 16th day of February, 1950, filed herein, for the following reasons and upon the following grounds:
"a. That said purported will was not executed as required by law.
"b. That at the time said instrument was purportedly executed by deceased, deceased lacked mental competency or capacity to make a valid will.
"c. That said instrument does not represent the will or desire of the said deceased, but was induced by fraud and undue influence practiced upon said deceased.
"d. That said purported will was intentionally destroyed and revoked by the deceased, and thereby is not a legal will of the deceased."
Mary Penshorn, Antoinette Day, and Anna Kanera filed similar objections. Upon application of contestants the will was certified to the circuit court of Allegan county, where the case was tried before a jury, resulting in a verdict by the jury upholding the instrument offered for probate as the last will and testament of deceased.
It appears that at the close of plaintiffs' proofs, defendants' counsel made a motion for a directed verdict, alleging that proponents have not established that there was a last will. Decision on the motion was reserved under the Empson act.[*] Thereafter *467 contestants moved for judgment notwithstanding the verdict. This motion was denied. Contestants moved for a new trial, giving the following reasons:
"Because the verdict of the jury therein is contrary to the great weight of the evidence.
"Because the court erred in charging the jury in substance that there was no presumption in the case to be considered by the jury that the will had been destroyed or revoked by the testator.
"Because the court erred in charging the jury, as follows:
"`You are instructed, if you find in this case that James Kanera was not on friendly terms with his sisters during the year 1949, after he had executed his will, and up until his death, then you may consider that fact as bearing upon the probability of his revoking his will, which gave them, that is his sisters, nothing and thereby leaving them three-fourths of his property.'
"Because the court erred in charging the jury, as follows:
"`Now members of the jury, you are instructed that there is no presumption in this case to be considered by you with reference to the destruction of the will in question. Where there is testimony in the case on the subject for and against any presumption that might otherwise exist disappears, a presumption may not be weighed against evidence. You are to consider the evidence offered on both sides and determine from such evidence whether James Kanera did or did not destroy his will made on the 25th day of April, 1949; that is destroyed with the intention of revoking it.'
"Because the court erred in charging the jury, as follows:
"`You are instructed that if you find that the contestants, or some of them, had opportunity to destroy the will in question either before or after the death of James Kanera, then you may consider their interest *468 in having the will destroyed, and while opportunity alone is not sufficient to prove that contestants did not destroy it, you may weigh such fact with the other proven facts in the case in determining whether or not they did in fact so destroy it.' * * *
"Because the court erred in permitting the witness, Charles F. Adams, to testify, over the objection of counsel, as follows:
"`Q. And will you tell us that nature of that home, what it is? * * *
"A. It is a home for widows and orphans of members of the Veterans of Foreign Wars.
"Q. Of which war?
"A. That is all wars as long as they are a member of the Veterans of Foreign Wars organization.
"Q. How long has that home been in existence?
"A. 25 years. * * *
"Q. What does the home  what do they do for orphans and widows there? * * *
"A. They take children, regardless of age, and keep them until they are self supporting.'"
The trial court denied the motion for a new trial and entered judgment upon the verdict.
Contestants appeal. In the case at bar it is established that James Kanera executed a will on April 25, 1949. The rule is well established that where a will which is known to have existed during the testator's lifetime, and in his custody, cannot be found at his death, a presumption arises that such a will was destroyed by the testator in his lifetime with the intention of revoking it, and in such cases the proponents have the burden of producing evidence to overcome or rebut such presumption; see In re Keene's Estate, 189 Mich 97 (Ann Cas 1918E, 367), In re Estate of Taylor, 271 Mich 404, In re Estate of Bernard Thomas, 274 Mich 10.
To rebut this presumption, proponents relied primarily upon declarations made by the deceased. Rose Sitzler testified that deceased had declared *469 many times, both before and after the execution of the will, and as late as November, 1949:
"Q. What, if any, conversation have you ever had with James Kanera concerning the disposition of his property?
"A. Well, he always told me that he would see that the orphans got something and he says, `You little orphan, I will see that you got something too. I will see that you got a roof over your head the rest of your life.'
"Q. You say he often talked about that?
"A. He did, very often.
"Q. He talked about that before April 25, 1949?
"A. Yes, he did.
"Q. He talked about that after April 25, 1949?
"A. Yes, he did. * * *
"Q. What, if any remarks did he ever make to you about your remuneration?
"A. He always says, `Rose, you don't have to worry, I will always see you have a roof over your head.' * * *
"Q. Did he make the remark during the year 1949?
"A. Oh, yes.
"Q. Can you fix the time in 1949?
"A. Well, when I asked him to come and make his home with my sister and myself then 
"Q. When was that now?
"A. That was during the time that my brother-in-law passed away. That was between October 26th and November 2d or so.
"Q. Of 1949?
"A. That's right.
"Q. All right. What did he say about that in November, 1949, or the latter part of October?
"A. Well, he says, `I don't see why you can't stay here and I will see that you have a roof over your head.' He says, `I don't want you to leave.'"
John Janis, a neighbor of deceased, testified that in September or October, 1949, the deceased stated:
*470 "Some time during the late fall I saw and talked with James Kanera. I talked to him several times a week. He was a neighbor of ours. He lived just across the parking lot from the hotel where he had his cottages. I was working on the hotel some time; after the season was over we generally do some repair work, and I was working. I did see Jim over there some time. As to about when that would be, I got to see him several times each week, whenever he was out and I continued to see him up until the time that I did leave Saugatuck. I had some conversation with him sometime on one of those occasions about his health and his property.
"Q. And when was that, about?
"A. That was either the latter part of September or first part of October.
"Q. And will you give us that conversation that you had with him, as near as you can?
"A. Well, we were talking about it and he was not feeling well. He was telling me that his heart was bad and that he was quite a sick man and that he would have to take things easy as almost anything that would aggravate him or so, would be the end. And he did tell me  we were talking about his health and I says  I says, `Well, you are lucky you have somebody to take care of you.' And he says `Yes'. And Rose was taking care of him at the time and he says he appreciated Rose being with him and that he said also that Rose would be taken care of."
Mrs. Pearl Palermo, a daughter of Rose Sitzler, testified:
"Regarding what, if anything he said about my mother and about her care for him, he always said that he would see that she had a roof over her head and he couldn't pay her wages, but that she could always file a claim and get paid that way.
"Q. You hear him say that, the last time you ever heard him discussing that, when was that?
*471 "A. Well, the last time I saw Mr. Kanera was in '49, the summer of '49, and we were quite busy with the cottages.
"He had rented the cottage we were living in also to some girls. He had rented a sleeping room rather, and we were busy straightening up and cleaning up after the girls. They made quite a mess. And I says, `Gosh darn, I would be darned if I would do this for nothing.' And Jim says, `Well, I haven't any money.' You know I mentioned about money, and I said, `I wouldn't work this hard for nothing.' I said, `Mum, you are a fool working for nothing.' I said `housekeepers are getting good money in the city.' And Jim says, well, he didn't like that. I guess, you know, it hurt his feelings. And Jim says, `You know I can't pay your mother, pay Mum, but I need her here.' I like Jim too, he was a nice friend. And he says, `The only thing I can do for your mother is to see she has a roof over her head and that she files a claim for wages after I go.'"
John Kanera was called by proponents for cross-examination. He testified that deceased told him he destroyed the will, and later testified that he saw deceased throw the will in the stove.
Proponents also produced evidence to show that contestants had an opportunity to destroy the will after the death of deceased, if it was then in existence, as 2 of deceased's sisters lived in the cottage the deceased had occupied as a home prior to his going to the hospital, and that after the funeral John Kanera opened the bag where deceased had placed the will.
Evidence was also introduced by proponents that deceased did not like his brother and sisters. Rose Sitzler testified:
"Jim did say, `I wish those girls would leave me alone.' And they were interfering with his business too much, telling him how to live, trying to live his life for him. This is conversation of Jim. As to what Jim told me about his sisters, he says he wished *472 they would leave him alone. He says, `I am getting along all right. I wish they would stay out of my life.' He says, `Whatever I have got I have earned by myself and I don't owe them anything.' James hasn't said anything much about John. But he was peeved when John was going to move because he would always move out for the fall and then the place would be empty all winter so he said, well, he was really through with him when he moved with him the last time. He says, `I am through with him now.' Regarding what ill feeling existed between James. Kanera and me prior to and at the time of my departure from his household on November 14, 1949, we parted friends. There was no ill feeling whatsoever. I never received any remuneration whatsoever from James Kanera for the time that I served at that place."
Contestants offered evidence to the effect that deceased told them that he had burned the will. Considering all the circumstances of this case, we are of the opinion that there was evidence for a jury's consideration that deceased had not destroyed the will. The court was not in error in failing to grant contestant's motion for a directed verdict.
Contestants urge that the court was in error in giving the following instruction:
"Now members of the jury, you are instructed that there is no presumption in this case to be considered by you with reference to the destruction of the will in question. Where there is testimony in the case on the subject for and against any presumption that might otherwise exist disappears, a presumption may not be weighed against evidence. You are to consider the evidence offered on both sides and determine from such evidence whether James Kanera did or did not destroy his will made on the 25th day of April, 1949; that is destroyed with the intention of revoking it."
*473 In Gillett v. Michigan United Traction Co., 205 Mich 410, we said:
"It is now quite generally held by the courts that a rebuttable or prima facie presumption has no weight as evidence. It serves to establish a prima facie case, but if challenged by rebutting evidence, the presumption cannot be weighed against the evidence. Supporting evidence must be introduced, and it then becomes a question of weighing the actual evidence introduced, without giving any evidential force to the presumption itself. In 1 Elliott on Evidence, § 91, p 114, it is said:
"`It (the presumption) may be directly rebutted by such evidence, or it may be shown thereby that it was never applicable to the particular facts, for it will be found that presumptions are usually very general in their nature, and lose their force and application when the specific facts of the case are shown;'
 and further (section 93, p 116):
"`A presumption operates to relieve the party in whose favor it operates from going forward in argument or evidence, and serves the purpose of a prima facie case until the other party has gone forward with his evidence, but in itself, it is not evidence, and involves no rule as to the weight of evidence necessary to meet it. * * * It is sometimes said that the presumption will tip the scale when the evidence is balanced. But, in truth, nothings tips the scale but evidence, and a presumption, being a legal rule or a legal conclusion, is not evidence. * * * It is not probative matter, which may be a basis of inference and weighed and compared with other matter of a probative nature.'"
And whether or not a presumption is rebutted presents a jury question; see In re Taylor's Estate, 271 Mich 404.
In our opinion there was testimony introduced by proponents that overcame the presumption. The *474 court was not in error in giving the above-quoted instruction.
Contestants also urge that they are entitled to a new trial, as the verdict was against the great weight of the evidence. In the case at bar there was evidence presented to the jury that testator did not want his brother and sisters to receive his property, that he had made provisions for Rose Sitzler, and that contestants had an opportunity to destroy the will. In Saginaw Milling Co. v. Mower, 154 Mich 620, we said:
"3. The determination of the essential question of fact * * * depended upon the conclusion the jury should reach as to their credibility * * * and although we must disagree with their conclusion, we cannot say that it is not based upon substantial testimony, nor invade their province of weighing conflicting testimony by determining that plaintiff's testimony was so contrary to the weight of the evidence as to justify us in reversing the ruling of the trial judge."
We conclude that the verdict of the jury was not against the great weight of the evidence. The court was not in error in denying a new trial.
Contestants also urge that the testimony of Charles F. Adams, regarding the Veterans Home, was improper and prejudicial.
It appears that during the trial Attorney Ten Cate testified as to deceased's interest in the Veterans Home:
"He told me about the Veterans of Foreign Wars home at Eaton Rapids. I remember that he mentioned that it was a very fine home and that it was for the widows and orphans of veterans and that he had heard about it and he went on at some length to tell me what a fine place it was, and that was where he wanted his property to go after Mrs. Sitzler was through with it."
*475 The trial court in denying contestant's motion for a new trial stated as follows:
"14. Testimony concerning the activities of the Veterans Home at Eaton Rapids was material to the issues in this case for the reason that decedent's interest in the Home as a veteran himself, and the inference of his continued interest in the Home, in the absence of any testimony concerning the change in his attitude, could properly be considered upon the issue of a likelihood of revocation of a will that provided substantially for the Veterans' Home."
Under the circumstances of this case, it was not prejudicial error to permit the jury to consider the testimony concerning the Veterans' Home.
Contestants also urge that it was error to admit evidence of an attempt by John Kanera to settle the case with Rose Sitzler. It appears that John Kanera was called as a witness by proponents for cross-examination. He testified:
"When I went over to Rose's place there, and her sister's place at Nunica, Rose's sister was there. And I wanted to talk privately with Rose. If I was just going to ask her about her dishes, the reason I was going to talk privately at Rose's was after I knew that there was going to be a court trial, I thought maybe she would have some suggestion to make that could avoid that. I knew she had an attorney at that time. I don't know whether I knew who her attorney was at that time or not. I didn't make any effort to find out; I never asked her."
Counsel for contestants objected to receiving this evidence for the reason that it was prejudicial and improper. We note that no reason was given as to why the testimony was prejudicial and improper, nor was any request made to strike it from the record. In Hynes v. Hickey, 109 Mich 188, we held that an objection to a question as "incompetent" was too *476 general for consideration on appeal. In Mulliken v. City of Corunna, 110 Mich 212, we held that an objection to testimony that was not responsive to the questions asked cannot be raised on appeal where no motion was made to strike it out. In Weiser v. Welch, 112 Mich 134, we held that an objection that an incompetent answer was received to a proper question will not be considered on appeal in the absence of a motion to strike out the answer. See, also, Renders v. Grand Trunk R. Co., 144 Mich 387, and In re Paquin's Estate, 328 Mich 293.
We find no reversible error and the judgment is affirmed, with costs to proponents.
DETHMERS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.
The late Chief Justice NORTH did not sit.
NOTES
[*] CL 1948, § 691.691 et seq. (Stat Ann and Stat Ann 1951 Cum Supp § 27.1461 et seq.).  REPORTER.