*In re* PERSONS ESTATE.

PERSONS *v.* HULSE.

1. WILLS — CONTEST — APPEAL — FRAUD — UNDUE INFLUENCE — EVIDENCE.

On appeal from jury's verdict disallowing a will, the testimony most favorable to contestants' claims of fraud and undue influence on the part of the chief beneficiary must be considered.

2. SAME—UNDUE INFLUENCE—CONDUCT OF CHIEF BENEFICIARY.

Conduct of the chief beneficiary under a purported will before or after its execution is a factor to be considered in arriving at a determination of whether undue influence was exercised in the making of the will.

3. SAME—UNDUE INFLUENCE.

Undue influence in the execution of a will may be insidious and not in front of witnesses, but fair inferences can be drawn from the facts.

4. SAME—UNDUE INFLUENCE—EVIDENCE.

Evidence presented in will contest *held,* sufficient to present question of undue influence by chief beneficiary upon testator, a divorced man, who lived at proponent's home, gave her a power of attorney and was not permitted to communicate with his children while at her home, where there was also evidence that she collected assets far in excess of expenditures on his behalf, such testimony amply supporting jury's verdict and justifying trial court's denial of a new trial.

5. SAME—INTERVENTION—DISCRETION OF COURT.

The trial court in a will contest did not abuse his discretion in permitting testator's daughter to intervene, where she had an interest in the subject matter of the litigation, offered no new or different objections to the allowance of the will and permission was given proponent's counsel for a continuance upon granting the petition to intervene (CL 1948, § 612.11).

6. EQUITY—INTERVENTION.

An intervenor comes in subordination to and in recognition of the propriety of the main proceeding in equity.

REFERENCES FOR POINTS IN HEADNOTES
[2–4] 57 Am Jur, Wills § 386 *et seq.*
[5] 57 Am Jur, Wills § 795.

Appeal from Saginaw; Huff (Eugene Snow), J. Submitted June 6, 1956. (Docket No. 17, Calendar No. 46,075.) Decided September 4, 1956.

In the matter of the estate of Charles Persons, deceased, Vera Hulse presented instrument purporting to be his last will and testament. Contest by Clifford Persons, Earl Persons and Ada Warner certified to circuit court. During trial Bernice Strong was permitted to intervene as contestant. Verdict and judgment disallowing instrument. Proponent appeals. Affirmed.

*Curry & Curry,* for proponent.

*Martin & Martin (Walter Martin,* of counsel), for contestants.

Sharpe, J. Charles Persons of Saginaw, Michigan, died on January 28, 1948, leaving an instrument purporting to be his last will and testament. It was dated January 2, 1948, and made his 4 adult children nominal beneficiaries, but left the major portion of his estate to the proponent, Vera Hulse. Charles Persons died at the age of 61 years from cancer. He was divorced from his wife in 1933. As a result of his marriage he had 2 sons and 2 daughters, contestants in this case. For many years Charles Persons was engaged in the business of house raising, repairing of houses and general contracting. He also bought and sold property. From the time of his separation from his wife until May, 1945, he lived alone, taking most of his meals at restaurants. His health began to fail in 1945. In May, 1945, he went to live at the home of Sam and Vera Hulse. On October 29, 1947, he entered Saginaw General Hospital where he underwent surgery for cancer. He remained in the hospital until November 17, 1947,

when he returned to the Hulse home. He again returned to the hospital on January 14, 1948. On January 15, 1948, guardianship proceedings were commenced against him by 3 of his children. The proceedings were pending at the time of his death.

The record also shows that sometime in 1944 decedent met Vera Hulse, and shortly thereafter she began taking care of decedent's books for him. Several months after Mrs. Hulse met Charles Persons, he became ill and Mrs. Hulse took him to her home to live. Decedent entered the hospital on October 29, 1947, accompanied by Mrs. Hulse. The admission records show that Mrs. Hulse represented herself as Mrs. Charles Persons when Mr. Persons was admitted to the hospital. Decedent had been sick approximately 6 months before entering the hospital, but had managed his own business affairs up until that time. When decedent went to the hospital he turned over to Mrs. Hulse a power of attorney to permit her to take care of necessary business transactions in his absence. Decedent remained a patient in the hospital from October 29th until November 17th. During that time he was visited by his daughter, Ada Warner, about every other day. She was not able to see her father privately. Mrs. Hulse was always present. Decedent was visited by his son Clifford every evening. The other children, Earl Persons and Bernice Strong, visited their father also. The decedent's children made arrangements to provide a bedroom for their father in Clifford's home and care for him until he was well again after he left the hospital. This arrangement seemed agreeable to decedent at the time it was mentioned.

During the time decedent was confined in the hospital, Mrs. Hulse called an attorney one morning about 1 o'clock to draw a will for Mr. Persons. She asked the attorney to come over right away to draw the will. The attorney did not draw the will.

On November 17th decedent left the hospital and returned to Mrs. Hulse's home. From November 17th until January 2d, when the will was signed, he was in her home. During this time Mrs. Hulse paid decedent's bills with his money. The source of the money was rents, payments on contracts, sales of property, and payments of contracting jobs. In a period of approximately 3 months prior to decedent's death, Mrs. Hulse personally raised $4,800 to $5,000 cash from decedent's assets and paid out $918.33 on bills she claimed were incurred on behalf of decedent.

A few days before the will in question was drawn, Mrs. Hulse called an attorney to come to her home and told him that Mr. Persons wanted to see him about a will. There is testimony that when the attorney talked to decedent, Mrs. Hulse was asked to leave the room. After the attorney had spent some time talking with decedent, the attorney notified Mrs. Hulse that Mr. Persons did not want to make a will at that time. Mrs. Hulse waited about 2 days and then called another attorney to come to her home. The attorney arrived with a secretary and notes were taken from Mr. Persons on how he wanted to have the will drafted. Nothing was drawn or signed at that time. The attorney returned on December 31, 1947, with 2 secretaries. The decedent was given a copy of the will and the will was read to him. The will was not signed that day because decedent wished to leave out one piece of property that he had left to a Mrs. Morlock. On January 2, 1948, the attorney again returned to Mrs. Hulse's home with 2 secretaries. The will was read to Mr. Persons by the attorney and the will was signed by Mr. Persons and witnessed by the 2 secretaries. A copy of the will was not left with the decedent. The original will was given to the attorney to be kept by him in his office safe. . .

On January 28, 1948, decedent died in the hospital. On the same day Mr. Persons died, Mrs. Hulse filed a petition in probate court for Saginaw county for the allowance of Mr. Persons' will.

On February 21, 1948, the contestants, except Bernice Strong, filed objections to the allowance of the will as follows:

"1. Because duress was used upon the testator in making said proposed will.

"2. Because undue influence was used upon the testator in making said proposed will.

"3. Because fraud was used upon the testator in making said proposed will.

"4. Because of the lack of formality in the execution of said proposed will."

At the same time contestants filed a petition to certify the will contest to the circuit court of Saginaw county. On June 16, 1948, an order was entered certifying the will contest to the circuit court of Saginaw county. The cause came on for trial, at which time the contestants introduced testimony.

Lawrence Covieo, a witness for the contestants, lived in Mrs. Hulse's home from December of 1947 to May of 1948. He testified that Mrs. Hulse introduced Mr. Persons to him as her husband and that Sam Hulse, her husband, was introduced to him as Mrs. Hulse's brother-in-law. Mr. Covieo also testified:

"There was a telephone in the home some 12 or 14 feet from where Mr. Persons was lying. He wasn't able to walk to the phone. The cord on the telephone wasn't long enough to carry it over to him. He told me he wanted to call Clifford. He always told me that. He asked one time to have the telephone put by him and he asked Vera Hulse to do that. But she never had the phone put within his reach. I was there when the children called for him. She would tell Charlie someone else called him. Sometimes

she'd take the telephone into the bedroom and talk there so Charlie couldn't hear her. There were times when Mr. Persons would ask if the children had called. And she would say that they didn't call. I was present when a letter was brought to the home by a police officer, a letter which I learned had been written by one daughter, named Ada. I know that letter has been introduced into evidence here. Mrs. Hulse got ahold of that letter and Mr. Persons never did get to see the letter. I don't believe he did get that letter that Ada wrote. I do know there were Christmas cards mailed by Frances, Earl Persons' wife. Mr. Persons did not get that card. Mrs. Hulse managed the business affairs of Mr. Persons. That is, his debts, and rent receipts, collections, and so on. * * *

"Q. Did you ever see her write the name of Charles Persons?

"A. Yes, I have.

"Q. Would you briefly tell the Court and jury how you saw that, or what you saw?

"A. I seen her practicing on the dining-room table one time—practicing his signature, and then she signed the title.

"Q. I show you exhibit No 15 and ask you to look at the front and back side of it. Is that the title you are talking about?

"A. Yes sir.

"Q. There is a signature on the back side, an assignment, in which the car title to this Packard business coupe was transferred over to Vera M. Hulse, and there is the signature on there and the name of Charles Persons. * * *

"Q. Did you see the person who wrote that?

"A. Yes, I did.

"Q. Who wrote that?

"A. Vera Hulse. * * *

"Q. Well, the day that Mr. Ryan was there in the afternoon, and after he left, what if anything happened then?

"*A.* Well, Vera got awfully mad at Charlie and she started raving so bad I had to leave the house myself, because I couldn't stand it.

"*Q.* What did she do, if anything?

"*A.* Kept walking back and forth in front of him and hollering at him, why he didn't make the will, and I asked Betty to come out, and we left.  *  *  *

"*Q.* Did she make any statements?

"*A.* She said, 'If you think more of your property than you do of me, give it to your dirty children.'

"*Q.* Did she talk in a normal tone of voice?

"*A.* No, she was raving.

"*Q.* And then you left?

"*A.* Yes, and Mr. Persons was crying when I left.
*  *  *

"*Q.* Where were the parties when you came back?

"*A.* She was in there; had her arm around Charlie's neck and was kissing him on the forehead.
*  *  *

"*A.* I was there the day Mr. Riser came. The first time he came in the afternoon. There were 2 girls with him. At that time I was in the bedroom, going back and forth between the bedroom and the kitchen. Vera Hulse was in the dining room, more or less, or the bedroom. The bedroom adjoins this living room. There is a little arch there but it is more or less one part. There was some conversation about his papers. Mrs. Hulse did not have the papers then. I believe Mr. Riser came back the evening of the same day, I'm not sure. He was there 2 or 3 times in all.

"*Q.* Well, were you there the day that this instrument was written or signed?

"*A.* Yes, I was.

"*Q.* And where were you?

"*A.* Sitting at the kitchen table.

"*Q.* And who else was present, if you know?

"*A.* Vera came out there after—well, it was after everything was done she came out in the kitchen.

"*Q.* Well, when she came out there, what if anything was done?

"*A.* The first thing she said was, 'It's all mine.'

\* \* \*

"*Q.* And what if anything was said?

"*A.* She asked me how long I thought Mr. Persons would live and I said probably 1–1/2 or 2 months.

"*Q.* What if anything did she say?

"*A.* She used a vile name and said, 'I hope he doesn't live that long.'

"*Q.* What did she say? Exactly what did she say.

\* \* \*

"*A.* 'I hope the old bastard doesn't live that long.'

\* \* \*

"I was present when Mr. Russell Persons first came over to the Hulse home to visit his brother Charles. I know that Charles didn't want him around the house. When Vera saw she couldn't get a will out of Charlie, she told Russell to go in and tell Charlie he was going to die. Mr. Charles Persons told his brother Russell that he didn't want him coming there. I heard Charlie tell Russell to get out of there and that he didn't want him coming back. Russell would come back to the house and would come at the back door but he didn't go into the other room where Charlie was. That continued until he died."

Matilda Howard, who operated a grocery store in Saginaw and who knew decedent as a customer for about 15 years, testified:

"This conversation I had with Mr. Persons (was) about 6 weeks before the will in this case was written on January 2d. This conversation was not held in the presence of Mrs. Hulse. I just asked him how he felt and he told me he thought he was going to get well, and I didn't know anything about his relations with her, but he spoke up and said he didn't trust Mrs. Hulse; that he was going to baby her along until he got on his feet and then he was going to leave. He said he had just given her $2,000 to pay labor and to pay bills. He didn't say anything about receipts and so on. I did have occasion to converse with him about his children when he would come into the store.

Of course I knew his children and he said that he and Clifford worked together. He liked his children."

Cecil M. Smith, a patient who shared a room in the hospital with the decedent, testified:

"He (Mr. Persons) did talk about his work and I did find out that he was a contractor. The woman wove into the conversation. After she was there one night, we were talking about her and he said she was an awful woman. I did not make any reply to that except to ask him what he meant. He said she would go through his purse and snap out a $20 bill in front of his eyes and one would never know it. This man told me that and this man was almost a stranger to me. I asked him that if she's that kind of a woman why don't you get rid of her. And he said he couldn't. He said he used to carry money to pay his bills on the job and that one time he knew he had $90 at night and the next morning he stopped to pay a bill and found he only had $3 in his purse. He mentioned he was staying at the Hulse home. He said after that he quit carrying large sums of money in his pocket. He kept it in his car.

"*Q*. What if anything did he have to say about that then?

"*A*. He said one night that this Vera Hulse was ironing and keeping him busy while her brother-in-law went out to his car and went through his car.

"*Q*. And did he have his money hid in his car? Is that what he said—at that time?

"*A*. At the time he said he did, and it was gone.
*    *    *

"While Mrs. Hulse was there in the room, Mr. Persons did talk to her about his business papers. He would ask her for receipts for payments she had made for him. I never seen any given to him. I don't remember that he asked for any other papers. He told me that she was supposed to pay bills for him and take care of his business. He mentioned that he had given her money to pay bills. That was on his mind quite a bit. He said he had given her an

amount to pay the bills. He said he had given her $1,800 to pay bills. He said he wasn't getting any receipts and it was worrying him. They would bring the bills up to him and he would give them to this lady. While she was there he gave her a hospital bill that was brought up to him and asked her to have the bill paid and she said she would take care of these hospital bills.  *  *  *

"I feel that Mrs. Hulse would say and do things that were out of the way. She was always talking about his children, that's about all. She said that they never cared for him, but now that he was going to die they wanted his money. I heard her say that to him.  *  *  *

"Q. What did he say?

"A. He said it was untrue.  *  *  *

"A. After she would leave, why he would cry pretty nearly for an hour.  *  *  *

"Q. Every time she was there, he would cry for an hour after she left?

"A. Not an hour each time, but he would be upset. He was down, about his troubles. He told me about his financial troubles. He stated that he gave her money to pay bills and wasn't getting receipts back and wondering what was becoming of the money. He told me he gave her $1,800. He did not tell me when and where he made this payment to her of $1,800. I don't know whether he ever had $1,800 at one time. He never said anything to me about his income, or how much he made."

Beatrice Smith, wife of Cecil Smith, testified:

"Mrs. Hulse talked to Mr. Persons a good deal about his children; about how they were always bothering him and about calling the doctor; how the doctor had said they shouldn't call him any more, because they bothered him so much. She just went on like that, kept bothering Mr. Persons with these things and worrying him about it, until after she was gone, he'd break down and cry about it then. That

would continue as I observed it until he left the hospital.

"Mr. Persons talked about Mrs. Hulse while I was there, though not so much. He would break down and cry about it. He would say he was worried mostly about his business affairs, because he wanted her to bring his books up to him so that he could straighten up his back work. She kept putting him off and told him not to worry that she was taking care of everything. He said he couldn't trust her.

\* \* \*

"The day he went home from the hospital he gave me a telephone number. He came to me and gave me this written number on a slip of paper and said, 'Just as soon as you get home, will you call this number and tell them that I'm leaving the hospital today, and to get in touch with me right away.' He said, 'Don't let her know about it.' And when he spoke of her, when he spoke of Vera Hulse, he always mentioned her as just 'her.' He never mentioned Vera Hulse by name. I can't remember what the number was, but when I went home I called the number and evidently he had written the wrong number, because the operator asked me what number I was calling and then she told me there was no such number. When I went back, Mr. Persons was gone, so I never found out who it was he was trying to get in touch with. I don't have that number. I never saw Mr. Persons after that. He never mentioned to me about making a will. The only other thing that I can recall right now is that Mr. Persons said that when he got out of the hospital he was going to see a lawyer and get his business straightened out; that he wasn't going to have her taking care of his business any longer."

At the close of contestants' testimony, proponent's counsel made a motion for a directed verdict for the reason that there was no competent evidence that Vera Hulse practiced undue influence upon Charles Persons. The trial court took the matter under ad-

visement under the authority of the Empson act[*]
and directed that the trial proceed. At the close of
all testimony proponent's counsel again renewed his
motion for a directed verdict. The trial court again
reserved decision on the motion and submitted the
cause to the jury. The jury returned a verdict in
favor of contestants.

On April 10, 1950, proponent's counsel filed a mo-
tion for a judgment notwithstanding the verdict for
the reasons previously given. The trial court denied
the motion, and in an opinion stated:

"This court does not consider it necessary to re-
view in detail the extensive testimony presented to
show the type of control which proponent Vera
Hulse exercised over decedent and his property dur-
ing his last illness. It is sufficient to say in summary
that there was credible proof that Charles Persons
was a careful, economical individual who was con-
cerned about paying the bills incurred during his ill-
ness, and that under the pretense of raising money
to take care of these obligations, proponent Vera
Hulse not only collected on decedent's rents, land
contract instalments and accounts receivable, but
also acquired considerable cash by selling various
items of property belonging to decedent, Charles
Persons. Contestants' evidence indicated that in a
period of approximately 3 months prior to Charles
Persons' death, proponent Vera Hulse personally
raised about $4,800 cash from decedent's assets, and
paid out about $918 on bills incurred in behalf of de-
cedent, Charles Persons. While conceding that there
may have been competent evidence to show that pro-
ponent Vera Hulse had (1) the opportunity, and (2)
the desire to exert undue influence upon decedent,
her attorney insists that there was no proof that she
actually did exercise sufficient fraud or undue influ-

* CL 1948, § 691.691 *et seq.* (Stat Ann and Stat Ann 1955 Cum
Supp § 27.1461 *et seq.*).—REPORTER.

ence upon decedent Charles Persons to invalidate his will.

"Contestants presented apparently disinterested witnesses, Beatrice Smith and her husband, Cecil M. Smith, who shared a hospital room with Charles Persons for a few days about the middle of November, 1947. They testified that Charles Persons was not hostile to his children and that proponent, Vera Hulse, talked to him against his children, finding fault with them and their motives, in an attempt to incite his ill will toward them, and that after proponent, Vera Hulse, left, decedent, Charles Persons, who was then very weak, would lie in bed and cry. Their testimony further showed that Charles Persons did not trust Vera Hulse but was worried about his bills and the control she was exercising over him and his affairs, and that although he was then unable to change things, he planned to do so when he got better. Proponent Vera Hulse admitted that she called an attorney about 1 o'clock, one morning, to come to the hospital and make out a will for decedent, but that he refused to come. There is also testimony that when Charles Persons left the hospital, without making a will, he went to Vera Hulse's home and that thereafter she kept decedent from any private contact with his family and from using the telephone, and that she would not let his children talk with him over the telephone, and that she fraudulently created a false impression that his children never tried to talk with decedent or inquired about him or displayed any interest at all in him.

"Contestants' testimony from Lawrence Covieo, who was then living at proponent's house, further showed that about a month after decedent returned from the hospital, in November, 1947, proponent, Vera Hulse, called decedent's usual lawyer, George Ryan, who came to the house and talked with decedent about making a will; that Ryan several times told Vera Hulse to leave the room, and that he finally called her, remarking that decedent did not want to make a will, and that if he changed his mind, he

should be called again. That after attorney Ryan
left, Vera Hulse began to rant and rave at decedent,
Charles Persons, and to abuse him for not making a
will; that decedent was crying and was too weak to
move from the davenport where he was lying, and
that he, Covieo, left the house with proponent's
daughter because he could not stand it any longer.
When Covieo returned to the house a couple hours
later, things were quiet again and proponent Vera
Hulse was kissing decedent. Vera Hulse then called
Attorney Martin Riser, who came to the house and
obtained information for the will which decedent,
Charles Persons, finally executed on January 2, 1948.
At that time Vera Hulse was in the kitchen telling
Covieo, according to his testimony, that now 'it's all
mine,' and that she hoped decedent would not live
another month.  *  *  *

"After a careful review of the lengthy record, this
court holds that there was an abundance of compe-
tent and credible testimony here in support of con-
testants' claims which made it necessary to submit
to the jury the material issues of fact presented by
the conflicting evidence in the case. Accordingly,
proponent's motion for a judgment notwithstanding
verdict is denied."

On September 12, 1952, proponent filed a motion
for a new trial, in part, as follows:

"Because the verdict of the jury therein is con-
trary to law.

"Because the verdict of the jury therein is con-
trary to the great weight of the evidence."

This motion was denied, and in an opinion the trial
court stated:

"In the instant case there were not only a wealth
of circumstances from which inferences of undue in-
fluence could be drawn, but also positive direct tes-
timony by one Lawrence Covieo of proponent's con-
duct toward the cancer-ravaged testator to cause
him to make a will immediately after his attorney

had talked to him for some time and then left the house with the statement to proponent that his client did not want to make a will.

"Since this court finds that in the instant case there was an abundance of competent, credible evidence to prove that the will as drawn was not the real will of the testator, but was the result of fraud and undue influence which proponent exerted upon him, and since the law of this State completely nullifies a will made under such circumstances, this court expressly holds that the verdict of the jury in this case was not contrary to law.

"(2) Proponent's contention that the 'verdict of the jury is contrary to the great weight of the evidence' is not supported by the facts. The court does not deem it necessary to review again all of the circumstances described in the court's opinion denying proponent's motion for a verdict notwithstanding judgment. Nevertheless, the testimony of the witnesses in the hospital to the effect that the testator did not trust proponent, and that he would get out from under her control as soon as he got better; that he was then very sick and weak; that he was taken back to proponent's home, where he was constantly under her control as he rapidly became worse; that his lawyer, whom proponent called to the house, stated that decedent did not want to make a will, and that as soon as the lawyer left the house, proponent began to rant and rave at decedent for his refusal to make a will, and that shortly thereafter proponent called another lawyer, who made a will giving virtually everything to proponent, to the exclusion of testator's children, makes out a much stronger case than contestants of a will can usually present.

"When taken in connection with the testimony that proponent had already acquired as much of testator's property as possible under a power of attorney; her statement after testator finally signed the will that the property is 'all mine,' and that she hoped the 'old bastard would not live' as long as a

month, together with all the other circumstances showing proponent's desire, purpose, opportunity and actions concerning the will, it appears that the evidence in this case goes far beyond that required to support a jury verdict setting aside a will because of fraud and undue influence."

Proponent appeals and urges that the trial court was in error in refusing to grant her motion for a directed verdict at the close of contestants' testimony. In the case at bar the verdict of the jury was for disallowance of the will. In such case we must consider the testimony which is most favorable to the claim of fraud and undue influence. *In re Niemschack's Estate,* 244 Mich 469. Conduct of the chief beneficiary before or after the execution of the purported will is a factor to be considered in arriving at a determination of whether undue influence was exercised in the making of the will.

We had occasion to discuss how undue influence may be exercised in *In re Paquin's Estate,* 328 Mich 293, 303, where we said:

"Undue influence may be insidious and not in front of witnesses, but fair inferences can be drawn from the facts. The question of credibility is always one for the jury who may not accept all or any part of testimony that they believe untrue. Credibility is a very important factor where facts are in conflict and witnesses have an interest in upholding or defeating a will."

In the case at bar it is an admitted fact that Vera Hulse had an opportunity to exercise undue influence and was inclined to do so. However, the question confronting us is whether she did exercise undue influence to such an extent as to direct and control the mind of Charles Persons in the execution of the purported will. There is evidence from which a jury could find that Charles Persons met Vera

Hulse in 1944, and shortly thereafter he went to live at her home and remained there except for 2 periods in the hospital; that on October 29, 1947, Charles Persons entered the hospital and remained there until November 17, 1947, at which time he was sick with a cancer; that he returned to the hospital on January 14, 1948, and remained there until his death on January 28, 1948; that prior to his first entry to the hospital, Charles Persons handled his own financial affairs; that when he went to the hospital he turned over to Vera Hulse a power of attorney to take care of his necessary business transactions, such as collection of rents, payment on contracts and payment of bills; that during the time Vera Hulse held the power of attorney she collected approximately $4,800 from Charles Persons' assets and paid out the sum of approximately $918 on bills incurred on behalf of Charles Persons; that Charles Persons was not hostile to his children, but that Vera Hulse talked to Charles Persons about his children in a critical manner; that after Charles Persons left the hospital for the first time and returned to the home of Vera Hulse, she kept him from seeing his children or permitting them to talk to him over the telephone, thereby creating in the mind of Charles Persons the impression that his children were not interested in seeing him or talking to him; that while deceased was in the hospital the first time, Vera Hulse called an attorney at 1 in the morning to come to the hospital to make a will for Charles Persons, but the attorney refused to come; that after Charles Persons returned to Vera Hulse's home from the hospital, she called George Ryan, an attorney, to come to her home to make a will for Charles Persons; that the attorney came, and after talking with Charles Persons, informed Vera Hulse that Charles Persons did not want to make a will; that after the attorney left, Vera Hulse began to rant and rave at Charles

Persons and abused him for not making a will, and that at this time Charles Persons was too weak to move from the davenport; that at a later date Vera Hulse called attorney Martin Riser who made the purported will on January 2, 1948, and that after the will was executed Vera Hulse stated in the presence of witness Covieo, "It's all mine" and "I hope the old bastard doesn't live that long."

Having in mind that Vera Hulse had actual possession and control of Charles Persons' abstracts, deeds and business, as well as the mental and physical condition of deceased prior to and at the time the will was made, her success in keeping deceased's children from visiting him and her successful attempt in making deceased believe that his children were not interested in his welfare, presents a question of fact for the determination of a jury as to whether undue influence was indulged in by Vera Hulse in becoming the chief beneficiary of deceased's will. It is our opinion that the facts and circumstances of this case, considered collectively in a light most favorable to contestants, presents an issue of fact as to fraud and undue influence.

We are also of the opinion that the trial court was not in error in denying the motion for a new trial. We are in accord with the reasons given by the trial court in refusing a new trial.

It is also urged that the trial court was in error in granting the petition of Bernice Strong to intervene as a contestant in the cause. It appears that Bernice Strong is a daughter of decedent and filed a petition to intervene and be joined as a contestant. This petition was filed after the cause had begun in the circuit court. At the time the court granted her petition for intervention, permission was given proponent's counsel for a continuance which was not taken advantage of. CL 1948, § 612.11 (Stat Ann § 27.663) provides, in part:

"In an action either at law, or in equity, anyone claiming an interest in the litigation may, at any time, be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding."

The theory underlying intervention is that the intervenor comes in subordination to and in recognition of the propriety of the main proceeding. In the case at bar, Bernice Strong, as a daughter of Charles Persons, had an interest in the subject matter of the litigation. She offered no new or different objections to the allowance of the will. It was not an abuse of discretion to allow intervention.

It follows that the judgment should be and is affirmed, with costs to contestants.

DETHMERS, C. J., and SMITH, EDWARDS, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.