*In re* POWERS ESTATE.

OPINION OF THE COURT.

1. WILLS—VERDICTS AND FINDINGS—MENTAL COMPETENCY—UNDUE INFLUENCE.

   A jury's finding "against the will" in a will contest encompasses either lack of testamentary capacity or the exercise of undue influence.

2. SAME—UNDUE INFLUENCE—ATTORNEY AND CLIENT—EVIDENCE.

   The issue of the relationship of the attorney and his client, and the attorney and his wife as beneficiaries in client's will, is an element in the broad concept of undue influence, going to the degree of proof necessary to establish prima facie the opportunity for the exercise of undue influence and the ultimate consideration of that question by the trier of the facts.

3. SAME—MENTAL COMPETENCY—PRESUMPTIONS.

   A testatrix was presumed to have had the mental competency to make a will (CL 1948, § 617.58).

4. SAME—MENTAL COMPETENCY—TIME.

   Testamentary capacity is judged as of the time of the execution of the instrument, and not before or after, except as the

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5] 57 Am Jur, Wills § 931.
[2, 13, 14, 20–22] 7 Am Jur 2d, Attorneys at Law §§ 96, 97.
[3] 57 Am Jur, Wills § 91.
[4] 57 Am Jur, Wills § 353.
[6–9, 11, 12] 57 Am Jur, Wills §§ 128, 129.
  20 Am Jur, Evidence § 856.
[10] 57 Am Jur, Wills § 146.
[15] 53 Am Jur, Trial § 463 *et seq.*
  39 Am Jur, New Trial § 54.
[16] 39 Am Jur, New Trial § 218.
[17] 53 Am Jur, Trial § 495 *et seq.*
  39 Am Jur, New Trial § 56 *et seq.*
[18] 53 Am Jur, Trial § 132 *et seq.*
[19] 53 Am Jur, Trial § 146.
[23] 57 Am Jur, Wills § 806 *et seq.*

condition before or after is competently related to the time of execution (CL 1948, § 617.58).

5. SAME—MENTAL COMPETENCY—EVIDENCE.

Evidence presented in will contest *held,* sufficient to sustain jury's verdict "against the will" on the ground of lack of mental competency on part of testatrix, if all evidence adduced by contestants was properly admitted and no reversible error committed in its admission.

6. SAME—MENTAL COMPETENCY—OPINION BY LAY WITNESS.

Evidence in the form of an opinion by a lay witness that the testatrix lacked testamentary capacity does not raise an issue for the jury, where it is shown that the witness expressing the opinion did not comprehend the requisites of testamentary capacity.

7. SAME—MENTAL COMPETENCY—IMPROPERLY ADMITTED TESTIMONY OF LAY AND EXPERT WITNESSES.

Jury's finding "against the will" in a will contest is set aside, where lay witnesses were permitted to testify that testatrix was mentally incompetent although disclaiming any knowledge of whether the testatrix possessed any of the specific elements of testamentary capacity and a psychiatrist was permitted to give prejudicial testimony quite foreign to the issue, the proceeding, as conducted, failing to be a fair trial.

8. WITNESSES—FUNCTION OF EXPERT—OPINION EVIDENCE.

The function of the expert witness is to supply expert testimony, including, when proper foundation is laid, opinion evidence even embracing ultimate issues of fact.

9. EVIDENCE—EXPERT WITNESSES—SCOPE OF OPINION.

The opinion of an expert witness may not extend to the creation of new legal definitions and standards and legal conclusions, such as a new legal standard for testamentary capacity.

10. WILLS—INSTRUCTIONS—DELUSIONS—MENTAL COMPETENCY.

The trial court in will contest committed error in failing to instruct, as indicated by request, relative to effect of delusions or hallucinations upon mental competency of testatrix to make a will at the time it was made.

11. SAME—NONEXPERT WITNESSES—OPINIONS.

Nonexpert witnesses should not be allowed to give their opinions that a testator was mentally incompetent when they testify to no facts inconsistent with sanity.

12. SAME—IRRELEVANT TESTIMONY—MENTAL COMPETENCY.

Courts of justice are not forums for the exchange of testimonial views on legal professional ethics, psychiatric definitions of legal instruments, testimonial observations on the professional obligations of realtors, social workers, and clergymen, and testimonial lay opinions on the broad concept of mental competency unrelated to the established requirements of testamentary capacity in a will contest and vague as to point of time.

13. SAME—MENTAL COMPETENCY—EVIDENCE—ATTORNEY-SCRIVENER OR FAMILY AS BENEFICIARY.

Whether proponent, an attorney, used questionable professional judgment in drawing an instrument wherein he was named as a beneficiary and his wife was named as residuary beneficiary is ordered not to be retried, since it is irrelevant, where jury's finding "against the will" is set aside because of error in the admission of testimony of lay and expert witnesses on issue of mental competency, the forum for testing unprofessional conduct of an attorney being adequately supplied in the State Bar grievance procedure.

14. SAME—MOTIVES OF COUNSEL.

The purity of motive of counsel representing persons found to be proper parties in interest is not to be the subject of consideration on remand of a will contest, since it is not in issue.

15. TRIAL—COMMENTS BY ATTORNEYS RESPECTING RESULTS TO CLIENTS.

Comments by attorneys as to what their clients can or cannot get out of the case are highly improper.

16. APPEAL AND ERROR—REMAND OF WILL CONTEST—ISSUES TRIABLE.

Retrial of will contest is limited to issue of testamentary capacity at time of executing the instrument presented, and the issue of fraud or undue influence in the execution thereof, including presumption created by fact that proponent was deceased's attorney and drew the instrument involved which left substantial bequests to proponent and his wife.

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and BLACK and SOURIS, JJ.

17. WILLS—NEW TRIAL—TESTAMENTARY CAPACITY—UNDUE INFLUENCE—FAIR TRIAL.

*New trial in will contest is ordered notwithstanding ample evidence was adduced to sustain jury's verdict either on the basis*

*that testatrix lacked testamentary capacity or on the basis of fraud and undue influence, but the trial, as conducted, was so overemotionalized and underdisciplined as not to have accorded either the proponent or the contestants a fair trial (GCR 1963, 865.1[7]).*

18. TRIAL—OBJECTIONABLE EVIDENCE—INSTRUCTION.

*Prejudicially erroneous evidence should be challenged promptly by appropriate objection, followed by a motion to strike whenever necessary, and an unequivocal ruling made with instruction to jury to disregard evidence which is ordered stricken.*

19. SAME—CONTINUING OBJECTION.

*The practice of reliance upon a continuing objection should be restricted to a clearly identifiable and brief line of inquiry as to which an objection is made, argued, and disposed of by ruling.*

20. WILLS — UNDUE INFLUENCE — LAWYER-SCRIVENER— BURDEN OF OVERCOMING PRESUMPTION.

*The burden of overcoming the presumption of undue influence by the lawyer-scrivener of a challenged instrument presented for probate as a will, who is favored thereby, is substantially greater than it would be had an independent and disinterested person prepared the instrument.*

21. ATTORNEY AND CLIENT—WILLS—PROFESSIONAL CODE OF ETHICS.

*It is contrary to the spirit of the professional code of ethics for an attorney to draft a will making disposition of property in his favor.*

22. WILLS—ATTORNEY-SCRIVENER AS BENEFICIARY.

*Testamentary dispositions of property in favor of the attorney-scrivener are properly looked upon with suspicion.*

SEPARATE OPINION.

BLACK, J.

23. WILLS—REMAND OF CONTEST—DISINHERITED HEIRS AS CONTESTANTS.

*Remand of will contest for retrial confined to issue framed by the petition for probate of will and the prosecuting attorney's notice of contest should be accompanied by an order to the circuit court striking from the record the notice of contest of collateral relatives of deceased who had been disinherited 6 times previously, in the exercise of the Supreme Court's power of superintendence of the judiciary (Const 1963, art 6, § 1).*

Appeal from Muskegon; Streeter (Halford I.), J.,
presiding. Submitted November 8, 1963. (Calendar
Nos. 98, 99, Docket Nos. 49,639, 49,868.) Decided
April 9, 1965.

In the matter of the estate of Lunette I. Powers,
deceased, Alexis J. Rogoski, proposed executor, peti-
tioned for probate of will. Objections filed by prose-
cuting attorney, acting for undesignated and un-
known charities, and by Phyllis E. Soles Anderson
and other heirs-at-law. Contest certified to circuit
court. Verdict and judgment for defendant-con-
testants. Plaintiff-proponent appeals from judg-
ment and order denying new trial and from denial
of a subsequently filed motion for a new trial. Re-
versed and remanded for further proceedings.

*Oscar E. Waer, John C. Cary,* and *Parmenter,
Forsythe & Steendam,* for plaintiff-proponent.

*Harry J. Knudsen,* Prosecuting Attorney, County
of Muskegon, on behalf of undesignated and un-
named charitable beneficiaries under a prior will,
defendant-contestants.

*John S. White,* for defendant-contestant heirs-at-
law.

O'HARA, J. This is a will contest. On behalf of the
proponents there were submitted to us 3 volumes of
appendix material totaling 1,294 pages, a 17-page
table of contents, a 197-page brief which lists 180
citations and a reply brief of 21 pages with 43 addi-
tional citations.

For the contestants we were favored with 2
volumes of appendix containing 573 pages, a 161-
page brief with 58 citations. We have noted a few
duplications in citation which might reduce the com-

bined total by a half dozen or so. Oral argument was spirited and comprehensive, if at times somewhat emotional.

The case was tried to a jury. A verdict, general in terms, was returned: "The foreman: We find against the will."

Motions for a directed verdict, for verdict *non-obstante veredicto* and for a new trial were made. It is from a denial of these motions that appeal is taken. Eighteen additional assignments of error are made, one of which reiterates on a specific ground, error in denial of a new trial. The others challenge refusals of requests to charge, admissions of and refusals to admit evidentiary matter.

Abiding all this, our scope of review is essentially limited. Were issues of fact created by conflicting admissible evidence? If so, the jury's finding thereon is controlling. If error was committed in admissions or exclusions of evidence, were they prejudicially reversible? Was there reversible error in the charge including refusals of specific requests— and, of course, that rather difficult to define question submitted in most jury cases—was the verdict against the great weight of the evidence? It would be rare, if not unique, in 8 weeks of bitterly contested litigation were no error committed. In this case there was. Some were harmless. The question must be confined to such error as would have denied to appellants the basic guaranty of a fair trial.

This case is no stranger to our bench. Antecedent this assigned Justice joining the Court, facets of the controversy were here in *In re Powers Estate,* 362 Mich 222; and *Rogoski* v. *Streeter,* 364 Mich 115. One wonders whether, as Tennyson's "Brook," the case is destined to go on forever.

Abstracted with diligence, these seem to us the relevant facts. Lunette Powers was born in Fowlerville, Michigan, October 18, 1875. Both her mother

and father were pharmacists. She, at a time when the accomplishment was relatively unusual for a woman, was graduated from the College of Medicine, Northwestern University, in 1897. She began practice of her profession in Muskegon. Shortly thereafter, she met Loretta Rogoski, whose maiden name does not seem to appear of record. Neither the doctor nor Mrs. Rogoski was at the time married. It is beyond discussion that they became close friends— a friendship that endured in varying degrees of intimacy till Dr. Powers' death. In 1919, 4 years after meeting Dr. Powers, Loretta nee whatever, married Alexis Rogoski. The friendship with Dr. Powers continued after the marriage. Mr. Rogoski is and was then a practicing attorney. Thereby comes this lawsuit.

On December 7, 1955, Mr. Rogoski drew a will for Dr. Powers. She had made a number of wills, holographic and otherwise, previously. This instrument made a number of specific bequests charitable, sentimental, and professional. It specifically omitted, with stated reasons, any relatives of Dr. Powers, most or all of whom she saw little or nothing of in her lifetime. The residual clause left the net estate to Mrs. Rogoski "in appreciation of our long years of friendship and her many acts of kindness to me." Mr. Rogoski and Bart D. Buck, Dr. Powers' financial adviser, were each left 1/5 of the estate. Mrs. Rogoski, in addition to being named as residual beneficiary, was also designated as a 1/5 beneficiary with her husband and Mr. Buck. Mr. Buck and Mr. Rogoski were designated trustees and executors. On December 22, 1955, a codicil was executed modifying the specific bequest to Mr. Buck, Mr. Rogoski and Mrs. Rogoski by substituting "5% of my estate instead of 1/5 thereof." On November 14, 1956, a second codicil was executed making some minor changes not involving the residual clause. Mr. Buck later

publicly declined to serve in any fiduciary capacity in keeping with the policy of the financial institution of which he was an officer and turned over to a Muskegon hospital "any legacy" that might come to him under the will. When the wills and codicils were sought to be probated, litigation culminating in the decision hereinbefore mentioned (*In re Powers Estate,* 362 Mich 222) took place. For its relationship to this cause, the decision remanded the controversy to the Muskegon county circuit court for the proceedings which are under review here. Mandamus to order a change of venue was denied proponent Rogoski in *Rogoski* v. *Streeter,* 364 Mich 115.

So what skeletal facts do we have—an attorney draws a will for a doctor friend of the family which leaves the bulk of a very substantial estate, upwards of a half of a million dollars—to his, the lawyer's, wife and names himself an additional beneficiary and an executor and trustee. In addition to being named as a specific beneficiary and the residuary beneficiary of the will, Mrs. Rogoski was named as a cotrustee of a "living trust" created by the testatrix in her lifetime. This trust was also drafted by Mr. Rogoski.

If any prizes were to be awarded for dismal professional judgment, the proponent here would be in a fair way to be signally recognized. Such is not (as we had to remind one counsel for the contestants on fiery oral argument before us) the issue here. We review a general jury verdict that "we find against the will." Such a finding encompasses either lack of testamentary capacity or the exercise of undue influence. The issue of the relationship of the attorney and his client, and the attorney and his wife as beneficiaries, is an additional element in the broader concept of undue influence. Essentially it goes to degree of proof necessary to establish prima facie the opportunity for the exercise of undue influ-

ence and the ultimate consideration of that question by the trier of the facts—in this case the jury.

We earlier built a skeletal framework of fact. Now we are obliged to advert to those elements of proof and legal concepts pro and contra bearing upon the validity of the instrument in question.

For the proponent it must be recognized that Dr. Powers is presumed to have had the mental competency to make her will.[1] We need not embellish the statutory citation with supporting case precedent. It is further the settled law of this jurisdiction that the testamentary capacity is judged as of the time of the execution of the instrument, and not before or after, except as the condition before or after is competently related to the time of execution. *In re Nickel's Estate,* 321 Mich 519, 526. Other supporting citations abound. We cite one only as indicative of the principle being settled law.

What then were the circumstances attending the execution of the instrument and its codicils, and what were the testatrix' objective manifestations of her mental condition on these occasions. Proponent Rogoski says in substance, and we paraphrase to narrative form in the interest of manageable brevity:

On December 3 or 4 (1955)  *  *  *  she said to me [at proponent's home]  *  *  *  "Mr. Rogoski, I am planning to go to Florida. I want to make my new will and I'd like to have it ready before I go." I asked if she were ready to give me the required information; she said she was. I took notes in sequence as she outlined her wishes. She said additionally, "tomorrow I will bring you a letter of instruction to attach" to it. She brought it to my office. I drafted the will in professional terminology on the 5th of December. On the 6th, Dr. Powers came to my office for the purpose of executing the

---

[1] CL 1948, § 617.58 (Stat Ann § 27.907).

will. I asked her to go into my law library and read
it carefully. I went on about my business. Some-
time later my receptionist said "Doctor is ready to
execute the will." I went to adjoining offices to get
witnesses. I found Elsie Moore who had witnessed
instruments for me before and Don McCarthy who
works in an office adjoining that in which Mrs. Moore
was employed. I asked doctor if she were satisfied
to have them witness her will. She so indicated.
She then signed the will in the presence of the wit-
nesses and they in hers and each other's presence. I
gave doctor a copy of the will, retained the original
with the letter she had previously delivered to me,
and put them both in my safe deposit box.

Significantly or not, as the jury was required to
determine, Mr. Rogoski then added (paraphrased):

I want you to reread this will carefully to see if
it meets with your approval, if it does, mail me a
letter stating that it meets with your approval. If
it does not, I want you to come right back and let
me revise the will to conform to your ideas.

Such a letter was directed by the testatrix to the
proponent and it became an exhibit 4. The letter
read:

"Dec 8/55
To express our thanks for your skill and kindness
in our business matter yesterday
"DR. LUNETTE I. POWERS
Muskegon, Michigan
                                    Muskegon, Dec 8/55
"A. Rogoski, Sr.
*"Dear Mr. Rogoski:*
"May I consume a few of your seldom vacant mo-
ments to let you know how very pleased this work of
yours for us yesterday was really very classic and
stated so clearly exactly what we wished. Thanks
much for your many kindnesses."

The witnesses to the instrument had this to say, again we narrate to obviate irrelevancies:

(Mrs. Moore.)
I am a legal secretary employed by a law firm whose offices are on the same floor as proponent's. It was a common practice to exchange courtesies of instrument acknowledgments between our offices.

We quote now directly:

"*Q.* Did you observe anything as regards the appearance, actions, speech or conduct of Doctor Powers at this time that caused you to question her mental capacity?
"*A.* No. * * *

"*Q.* And, I now show you plaintiff's or proponent's exhibit 3 which is a document in the form of a codicil dated November 14, 1956, bearing the signature of Lunette I. Powers, M.D., and the signatures of Elsie J. Moore and M. C. Locke, and ask you if you can identify this as your signature?
"*A.* Yes. That is my signature.

"*Q.* And, do you recall the circumstances under which you affixed that signature?
"*A.* Well, Mr. Rogoski asked me to come down and witness the codicil to Doctor Powers' will. And, Mr. Locke and I witnessed the will. Of course I had at that time already met Doctor Powers, so I knew her.

"*Q.* You had met her?
"*A.* When I signed the will.
"*Q.* When you signed the original will?
"*A.* That is right.
"*Q.* So you knew her?
"*A.* That is right.
"*Q.* Yes. Was there any conversation at that time?
"*A.* Oh, she remembered that I had witnessed the 1955 will.

"*Q.* And, she recognized you?
"*A.* Yes.

"*Q*. And, she remembered that you had witnessed her previous will?

"*A*. Yes.

"*Q*. And, she said so?

"*A*. Yes.

"*Q*. Did you at that time observe anything about her appearance or her speech or conduct that caused you to question her mental capacity?

"*A*. No.  I thought she appeared about the same.

"*Q*. The other witness is Mr. Locke, and he is an attorney?

"*A*. That is right.

"*Q*. Of your acquaintance?

"*A*. Yes.

"*Q*. You may cross examine."

As to the other witness and the December 7th will, we again quote:

"*Q*. Now Mr. McCarthy what is your occupation?

"*A*. I am an insurance agent.

"*Q*. Associated with what insurance office?

"*A*. Caughey-Schuler-McCarthy Agency.

"*Q*. Where is your office?

"*A*. Fourth floor, Hackley Bank building.

"*Q*. Where is it with respect to the Rogoski law office?

"*A*. Across the hall and down about two doors at this time.

"*Q*. In 1955?

"*A*. At the end of the hall and about four doors away.

"*Q*. That is where it was in 1955?

"*A*. Yes.

"*Q*. Where was it in 1955 with respect to the office where Mrs. Moore was employed?

"*A*. Right next door to their office.

"*Q*. I show you proponent's exhibit 1, being the purported will of Lunette I. Powers, dated December 1955, and ask if you identify this as your signature?

"*A*. Yes, it is.

"*Q.* Do you remember the circumstances under which you affixed your signature?

"*A.* I was asked to witness the will.

"*Q.* Will you tell the jury please what you can recall of this incident?

"*A.* As I recall I was in my office when Mr. Rogoski came to it, and asked me to witness a will for him. I went down the hall I believe by myself, and into his private office, and in the presence of Mrs. Moore and Mr. Rogoski and Doctor Powers, witnessed her signature.

"*Q.* By signing your name. Did you see her sign herself?

"*A.* Yes, I did.

"*Q.* And, did you see Elsie Moore sign herself?

"*A.* Yes, I did.

"*Q.* Do you recall any conversation at that time?

"*A.* There wasn't too much conversation. Doctor Powers was asked whether or not she desired us to act as witnesses and she replied 'yes.' And, also did she understand that she was signing her last will and testament, which she answered she did.

"*Q.* Now, did you observe anything in her appearance or her manner of speech or her conduct that led you to question her mental capacity?

"*A.* No.

"*Q.* Did she appear to you to be an intelligent woman?

"*A.* I don't believe I am qualified to look at somebody and tell you whether they are intelligent or not.

"*Q.* Did she appear to be alert?

"*A.* I would say she was alert, yes.

"*Q.* When she said that she knew she was signing her will, did you believe that she did know that?

"*A.* I believe so."

The first codicil was witnessed by Charles Schuler, deceased at the time of trial, and Allan S. Lidke, an attorney. His relevant testimony is quoted:

(Mr. Lidke.)

"*Q.* I show you proponent's exhibit 2 purporting to be a codicil to the will of Lunette I. Powers, dated December 22, 1955, and ask you if you recognize your signature at the foot of it?

"*A.* I do. That is my signature.

"*Q.* And, also do you know the signature of Mr. Schuler?

"*A.* I do.

"*Q.* Is that his signature?

"*A.* It is.

"*Q.* Yes. Do you recall the circumstances under which you signed this?

"*A.* Mr. Rogoski came to my office and asking whether I would witness, I thought a will at that time, I thought that was the words he used, and asked me to come to his office and I followed him down there, got into his office. I don't know now whether it was a reception room or whether it was a library. I wouldn't say which room it was. And, there was an elderly lady sitting there. And, he said 'Doctor Powers, this is Mr. Lidke. He is a lawyer on the same floor. Do you want him to witness this?' She said 'Yes.' She proceeded to sign and I signed my name as a witness. I left the office.

"*Q.* Did you observe anything in the speech, actions or conduct of Doctor Powers that at that time would cause you to question her mental capacity?

"*A.* I didn't. But, I didn't make much of an observation, Mr. Parmenter.

"*Q.* I understand. But, did you see anything or hear anything at that time that would cause you to question her mental capacity?

"*A.* No, I didn't.

"*Q.* You may cross examine."

The other involved witness is likewise an attorney. As to the November, 1956, codicil, he testified:

(Matthew C. Locke.)

"*Q.* I show you proponent's exhibit 3, which is the codicil of November, 1956, and ask you if you identify your signature?

"*A.* I do.

"*Q.* Mr. Locke, will you tell us to the best of your recollection of this event of when you acted as a witness?

"*A.* Well, at this time I shared office space with John Frederick, at suite 411 Hackley Bank building down the hall from Mr. Rogoski's office. And, to the best of my memory Mr. Rogoski came and asked me if I would come up and witness a signature, and I said 'yes I would.'

"*Q.* Was that the usual transaction?

"*A.* I witnessed other papers for him at his request, and have had papers witnessed in his office, or by his office at my request.

"*Q.* Go ahead.

"*A.* So, I went to his office, and I recall Miss Moore, or Mrs. Moore, pardon me, was right at the door at the same time. She had come from the front of the building, and we were ushered into the room, and this elderly well-dressed lady was sitting there. And, Mr. Rogoski said 'Doctor Powers, this is Mr. Locke. He is an attorney in the next office down the hall.' And, I acknowledged the introduction. And, I said 'I have heard so much about you, and read about you in the papers, it is a pleasure to finally meet you.' And, she acknowledged my little statement. At that time this document, I believe, was already laying out on the table. And Mrs. Moore and I were asked to act as witnesses. I think the statement was that she wished to change her will. I don't recall the word codicil being used at that time, but as a lawyer I knew it meant a codicil to a will. So, Doctor Powers signed the instrument in the office, and we both signed our names in the presence of Doctor Powers, and we left.

"*Q.* Was there any conversation between you and Doctor Powers, or between Doctor Powers and any other party there beyond what you recited?

"*A.* Yes. There was this, that after she signed her name I commented on the fact of beautiful penmanship, having in mind her age and showed a very firm hand.

"*Q.* Did she respond?

"*A.* She was very modest, just kind of smiled.

"*Q.* Did you observe anything in her speech or her manner or her appearance, conduct, that would cause you to or did cause you to question her mental capacity?

"*A.* None whatever.

"*Q.* Did you observe anything in connection with this transaction that appeared to indicate to you that she was acting under any duress?

"*A.* No.

"*Q.* Was the transaction so far as the signing and witnessing is concerned, conducted in accordance with the usual and customary standard of lawyers that you are acquainted with?

"*A.* I thought so.

"*Q.* That is all."

As against the foregoing testimony bearing upon testamentary capacity at the time of the execution of the will and the codicils, no direct testimony was available. Cross-examination elicited the fact that neither the will nor the codicils thereto were read to the testatrix at the time of execution. Redirect examination countered with the attorney's testimony that such practice was not unusual.

For the contestants, Dr. Leonel Loder, an ophthalmologist, testified to testatrix' seriously impaired vision by reason of occlusionary complications and deterioration from 1951 through 1955. Dr. Lemmen, a neurologist-ophthalmologist testified to the accentuation of any peculiarities a subject would exhibit as a result of what was characterized as a "slight

stroke." Both doctors related these conditions in
a general way to 1955 and 1956, and to the dis-
orientation of testatrix at that time. A number of
Dr. Powers' medical associates, hospital staff
nurses, neighbors, close associates, and life-long
friends testified to a litany of deviations from nor-
mal conduct running from mild eccentricity to com-
plete loss of sense of time and place. Unquestion-
ably, some time before her ultimate confinement in
the State Hospital at Traverse City, and as early
as January, 1957, Dr. Powers began to suffer from
hallucinations and worse. By that time she was a
sick, miserable, if not completely mentally incompe-
tent person. On January 17th of that year she
suffered a complete mental collapse, diagnosed as a
senile psychosis. In the interim, between the time
of the execution of the will and its codicils and her
commitment, she deteriorated mentally and it is not
at all beyond the range of legitimate inference that
the process began earlier. Proponents participated
in effecting the surrender of her narcotics' license
in June of 1956. Most of the witnesses produced
by contestants—around 30 in number—are classified
in groups: Old friends, neighbors, employees, and
professional colleagues (M.D.'s and R.N.'s). All of
these testified to varying degrees of a social, eccen-
tric, irrational, and professionally substandard con-
duct. The closest in point of time is that of Dr.
Hartwell who drove testatrix to a party sponsored
by medical associates of hers. They were younger
and known as "Powers Boys" because she wrote
them dutifully while they were in military service in
World War II. We have scrutinized the excerpts
quoted in the appendix and the meaning urged for
it by contestants. There is a vast deal of testimony
included that failed to meet the test of relevancy;
among it was the purported ethical professional
standards of attorneys. Proponent and his wife,

under gruelling cross-examination, were asked improper questions viewed even in the wide scope allowed in attacking the credibility of witnesses.

Most of the witnesses fix January of 1955 the date of death of Dr. Powers' long-time friend and driver, Miss Mann, as the time when her most noticeable change in general conduct pattern took place.

It is fair to say that if all the evidence adduced by contestants were properly admitted—and no reversible error in its admission took place—there is ample basis upon which to sustain the jury's finding, so far as it reflected lack of testamentary capacity.

We will turn now to an analysis of some of the specific testimony to which objection was made and motions to strike addressed on the question of Dr. Powers' testamentary capacity by nonexpert lay witnesses.   We set out the questions and the responses thereto and examine them:

(Eugene R. Ruel.)
"*Q*. All right.   Now, based upon your observations of Doctor Powers, say in the spring of 1955, and throughout the year of 1955, based upon these things you have told us about, do you have any opinion as to whether or not Doctor Powers was mentally competent during the year 1955?

"*A*. Yes, I do.

"*Mr. Parmenter*: I object to the witness giving an opinion that the testatrix was mentally incompetent, because he has testified to no fact or facts inconsistent with *mental capacity to make a will.*
\* \* \*

"*The Court*: I will allow him to give his own opinion.   The jury will understand that it is based entirely upon what facts he had before him, and I will allow the jury to give it what weight they feel is justified.

"*Q*. What was your opinion?

"*A*. Well, that she was deteriorating, I thought possibly mentally.   She didn't seem alert.   From

the way I can draw my opinion is from when I knew her in 1946 and 1947, how alert she had been, and then seeing her after this, that there was such a definite change in her manner of walking and she'd stare and so forth.

"*Q.* I think you said that you felt there was some deterioration. Do you have any opinion as to whether or not she was mentally competent?

"*A.* Well, I don't. I believe at that time she wasn't.

*Cross-examination by Mr. Parmenter.*

"*Q.* Mentally competent to what, Mr. Ruel?

"*A.* Well, as persons grow older I think you, I think possibly that they seem to kind of deteriorate in their quickness and in their, possibly thought and actions.

"*Q.* Would you have an opinion as to whether or not at this time whether *she had the mental capacity to know the extent of her property?*

"*A. I would not know.* I didn't know anything about her real estate or any of her affairs.

"*Q.* Well, would you know whether—would you have an opinion as to whether she had enough sense, enough mind to realize *what her property consisted of?*

"*A. No, I wouldn't.*

"*Q.* Would you have an opinion, Mr. Ruel, as to whether or not at that time, in the fall of 1955, she had enough sense to know who would be the members of her family, and who would be her friends and *who would be the natural objects of her bounty?* Would you have an opinion as to whether she had sense to know these things?

"*A.* No, I wouldn't."

Clearly the foregoing witness' opinion previously given should have been stricken, if need be on the court's own motion.

To justify admission of the witness' opinion as to testamentary capacity, a minimal showing that he

at least understood the term was required (95 CJS, Wills, § 462, p 433):

"Evidence in the form of an opinion that the testator lacked testamentary capacity does not raise an issue for the jury where it is shown that the witness expressing the opinion did not comprehend the requisites of testamentary capacity."

Such is the situation here. The witness disclaimed any knowledge of whether the testatrix possessed any of the specific elements of testamentary capacity. The opinion broadly based on "mental competency" generally "during 1955" was under these circumstances inadmissible.

(Steven G. Zarnas.)

"*Q.* Now, based upon what you have seen of Doctor Powers during your employment at the bus station, through March of 1956 on up until say January of 1957, based upon what you saw, do you have an opinion as to whether or not she was mentally competent during the times that you saw her?

"*A.* Yes.

"*Mr. Parmenter:* I object to the witness giving an opinion if the testatrix was mentally competent, because the witness testified to no fact or facts inconsistent with mental competency.

"*The Court:* I will allow him to answer, and the jury will give it what weight they are entitled to in view of the fact.

"*Q.* You say you do have an opinion?

"*A.* Yes, I do.

"*Q.* What is you opinion?

"*A.* Well, from observing Doctor Powers at the time, I felt that she was *mentally ill*. I mean this is my own opinion. I am no doctor, but this is what I feel."

The equivocal nature of this witness' testimony that "I felt * * * she was mentally ill" is sus-

ceptible to the same infirmity as that of the preceding witness.

We are not prepared to say that the admission of the opinion evidence of the 2 previous witnesses taken alone would be reversibly erroneous. Its admission, however, must be viewed together with other evidence erroneously admitted as the composite affects the total atmosphere of a fair trial to which both parties were entitled.

The testimony allowed to be given by the expert Dr. Watson, a psychiatrist (through no fault of his and our criticism is not directed to him) is so foreign to the issue in a will contest as to border upon the ludicrous. For example:

"Well, how about the relationship of lawyer and client *or doctor and patient or some other similar professional relationship?* Let's talk about, well, let's talk about lawyer and client. That might be a good starting place.

Objection—(by proponent's counsel).

*"The Court:* I will allow him to answer the question.

[without an answer to the previous "question," if it were in fact a question, counsel for contestants continued]:

*"Q. There is plenty of evidence for the jury and the court to recognize the situation. What I am trying to get at here is the unique situation between the lawyer and his client or a doctor and his patient and the reliance and the trust that is reposed therein with respect to one's trust and thus influence ability.* Then after that we can determine the ordinary amount that is repossessed [reposed?] in that relationship, we can talk then about our influence. But manifestly, we can't talk about undue influence until we can talk about the norm of what is influence in such a situation and that is what I seek to do.

*"The Court:* I will allow you to proceed.

*"A. One of the characteristics of all professional relationships is that the person who comes to the*

*professional comes completely unequipped to take care of their own interests in that relationship.* For example, my patients come to me and they seek my professional advice as a psychiatrist. They have no way whatsoever of knowing whether I am good, bad, or indifferent. They must trust me and this places upon the relationships certain psychological characteristics which in my opinion and *in the opinion of most of my colleagues* is a very vital core part of all professional relationships and that is, the patient comes in and very blindly assumes that you will take care of them on one hand. They place themselves in your hand and they attribute to the professional, I am speaking generally now, all sorts of magic which in fact, you do not possess, and it is the central issue of all professional ethical responsibilities to avoid accepting this magic and acting upon it. *It is your duty as a doctor or a lawyer to hold back the powerful tendencies of your patients and your clients to let you do things to them and for them that [are] inappropriate because they in fact are only giving you this blind trust and they are not weighing the pros and cons of whether you will handle them well or not. This is the basic element of our professional obligation in all the professional relationships. Lawyers, psychiatrists, social workers, ministers, teachers, and we expect our professionals to do this."*

While the foregoing dissertation on the obligations of doctors, psychiatrists, real-estate agents, social workers, ministers, and teachers might make an interesting topic for a joint seminar of the specified callings, the conclusions implicit in the answer were lethally prejudicial to the proponent. Very shortly thereafter, in response to another (*sic*) question, Dr. Watson (on cross examination) supplied testimonially this novel addition to the legal definitions of a will and of testamentary capacity:

"As a layman again, I can't certainly remember the will, but wills are *complex psychological phenomena* * * *

"*Q.* Do you think that our society is replete with people who are transacting business, practicing professions, transacting business with the bank, buying and selling securities, making reports to the government and doing all these things who don't have the bare mental equipment required to make a will and yet cannot be observed by their fellow citizens?

"*A. No, the standard of incompetency to make a will is much broader.*" (Emphasis supplied.)

Even though the foregoing was adduced on cross examination, it exceeded permissible bounds. It substituted for the established legal tests of testamentary capacity the espoused standard of the testifying expert.

The function of the expert witness is to supply expert testimony. This includes, when proper foundation is laid, opinion evidence. This opinion evidence may even embrace ultimate issues of fact. *Dudek* v. *Popp,* 373 Mich 300, 307, and the court rule there cited.

What the opinion of an expert does not yet extend to is the creation of new legal definitions and standards, and legal conclusions. We adverted to this general proposition as lately as *Washburn* v. *Lucas,* 373 Mich 610, 617.[2] Though the holding there was concerned with a legal conclusion "the right of the intersection" in an automobile negligence case, the analogy to be drawn is poignantly clear. Whatever latitude presently attends the expert's conclusionary testimony in that field, it doesn't extend to creating new legal definitions of negligence or prox-

---

[2] While this citation is to a dissenting opinion as to decisional results, by separate concurrence, the majority agreed with the dissent as to the evidentiary question. See the majority opinion at pp 620, 621.

imate cause. Neither in this area does it extend to the creation of a new legal definition of a will, nor a new legal standard for testamentary capacity. There must be some point, objection or no, at which a court *sua sponte* is obligated to say judicial determination is still something more than choosing between conflicting theories of expertise. That point was reached in this case. The short of it is that while the verdict of the jury is completely sustainable by the testimony, the whole proceeding failed to measure up to what need not be defined here again—a fair trial.

We mention, in addition, other error which might be expected to occur in the event of retrial. Proponent specifically requested instruction upon the relationship of hallucination to testamentary capacity. Evidence was introduced that Dr. Powers' mother died in 1927 and her father in 1934, but that she labored under the hallucination and delusion they were still alive; that she would put her mother to bed and try to keep everybody quiet so they would not disturb her; that she would go through the house calling her mother and father and scolding them because they did not answer; that she had a chair her father liked to sit in, which she kept handy for him when he visited her; and that she was going to make a trip to Portland, Michigan, as her parents would be glad to see her.

The trial judge refused to give appellant's instructions and in no way covered the issue of delusion in his charge. Appellant contends that:

"In the absence of instructions covering the subject, it was inevitable that the jury would have a misconception of the effect of delusions upon testamentary capacity and would conclude that a person who was subject to delusions was mentally incompetent to make a will."

Appellees answer:

"We do not claim that an insane delusion affected Dr. Powers' will. She thought her parents were alive and put them to bed in 1955, but she did not put them in her will. This was not the question.

"We do say, however, that the many delusions Dr. Powers suffered show that she was mentally incompetent in 1955 to make a will."

Chief Justice COOLEY in *Rice* v. *Rice* (1884), 53 Mich 432, called attention to the trial judge's duty to instruct *in re* delusions (hallucinations) as follows (pp 434, 435):

"Several witnesses called for the contestants, after testifying to the facts tending to prove the delusions which have been referred to, were allowed to give their opinion whether the decedent had capacity to make the will in question, or to dictate its terms. Perhaps the evidence was admissible in every instance; but it is impossible to read the record without being convinced that the opinions testified to were formed mainly, and in some cases probably exclusively, on the talk of the decedent which indicated the delusions referred to and that the witnesses, in giving their answers, were, in some cases at least, under a mistake as to the effect of such delusions upon testamentary capacity. Mischief from such evidence is likely to result, unless carefully guarded against by the trial judge in his instructions; but it must of necessity be left to him to give the proper cautions."

We believe the trial court committed serious error in not instructing the jury in regard to delusions. We are constrained to agree with appellant that without such an instruction the ordinary juror would conclude that a person subject to delusions was testamentarily incompetent. Such conclusion is legally erroneous and the failure to instruct on the question constituted reversible error.

We include an additional caveat. Lay witnesses, before they may express a testimonial opinion as to testamentary capacity must testify first to facts inconsistent with sanity. See *Hibbard* v. *Baker,* 141 Mich 124 (syllabus 3):

"Nonexpert witnesses should not be allowed to give their opinions that a testator was mentally incompetent when they testify to no facts inconsistent with sanity."

This test should be observed as to all nonexpert witnesses who might be called, including those who already testified in the court below.

The trial of the case was overemotionalized and underdisciplined. This was reflected in the briefing as well as in argument before us. We do not take kindly to the statements in contestant's brief:

"The jury judged it [this case] on the facts. The visiting judge affirmed their verdict. *We are confident that this Court will do likewise irrespective of personal feelings for Mr. Rogoski."* (Emphasis supplied.)

We do not apprehend what counsel believes this Court's "personal feelings" for the proponent are supposed to be. We do apprehend that courts of justice are not forums for the exchange of testimonial views on legal professional ethics, psychiatric definitions of legal instruments, testimonial observations on the professional obligations of realtors, social workers, and clergymen and testimonial lay opinions on the broad concept of "mental competency" unrelated to the established requirements of testamentary capacity, in a will contest and vague as to point of time; the financial ability of an attorney-beneficiary to afford first-class passage to an American Bar Association convention; the significance of the make, model, and year of the

car he drives and his previous year's income tax return, all of which came into the record. No appellate duty is so distasteful as to set aside the ultimate conclusion of 8-weeks' trial, an infinity of time in legal research and briefing, a prodigal amount of money, and the expenditure of sorely needed judicial time. To do otherwise here, however, would be to abdicate our duty in rationalization of the outcome by reason of the foregoing factors. We have no alternative but to reverse and remand.

Whether proponent used questionable professional judgment in drawing the instrument involved need not be retried; it is irrelevant. Proponent's status as a member of the bar of Michigan adds not one centimeter, nor subtracts one from his position as a party litigant, and this question should take no time in trial.

The following questions, answers, objections, and rulings of the court are exemplary of such irrelevant matter:

"*Q.* And I will ask you, Mr. Clink, if whether or not having been a lawyer for 27 years and a prosecuting attorney, and a probate judge, you are acquainted with the standard of conduct, standard of practice of attorneys in this community, concerning the drafting and execution of wills. * * *

"*Mr. Cary* (*Appellant's attorney*): If it please the court, this question here gets us into an entirely new and distinct lawsuit as to the question of ethics. And as a question of the proper drafting of wills. The issue here is the mental competency of Dr. Powers at the time the will in question was drawn and whether or not undue influence was exerted. Now, the question of what this gentleman's opinion is as to the ethical practice of drawing wills is entirely different lawsuit which is a matter to be considered by another tribunal, if the matter is ever brought to such a status. And here we have spent considerable time in connection with the trial of

this case and to go further into collateral issues is going to prolong the time of that trial. Now, how it could in any way bear upon the issues of this particular controversy, is a matter that is an entirely different issue. As to whether or not Mr. Alexis J. Rogoski followed the practice or didn't follow the practice, or that [it?] is a matter that is for an entirely different tribunal and not for this one, and only raises collateral issues here which would tend to pass clouds upon what the real issues are and get us into matters which are prejudicial to the case of the proponent and we seriously object to such testimony and such matters of controversy which are entirely beside the point.    *   *   *

"*The Court:* I will allow you to proceed.    *   *   *

"*Q.* Mr. Clink, would you be familiar with that standard of practice in December of 1955?

"*A.* Yes.

"*Q.* Now, I will ask you, in your opinion what the standard of practice is concerning a lawyer drafting a will for a nonrelative, making himself and a member of his immediate family a beneficiary under that will?

"*A.* Well, this standard would require of referring of that client to another attorney.    *   *   *

"*Q.* All right. Now, Mr. Clink, if I told you that testimony has been brought out at this trial that an attorney in this community drafted a will for a nonrelative leaving at least a portion of an estate to himself and to his wife, do you have an opinion as to how this conduct would measure up to the standard of conduct of other attorneys in this community?

"*Mr. Cary:* If Your Honor please, that is a hypothetical question put to this man as an expert and it does not contain all of the elements of a hypothetical question as to all of the facts which would have to be taken in consideration to answer this question, and it does not comply with the rules as to hypothetical questions and is inadmissible and incompetent.

"*The Court:* I will allow him to answer.

"*A.* I do.

"*Q.* And what is your opinion?

"*A.* My opinion [is] would be highly unprofessional."

The forum in which to test unprofessional conduct of an attorney in this State is adequately supplied in the State Bar grievance procedure. The forum in which not to test it is a jury trial determining testamentary capacity and undue influence.

The purity of motive of the advocates representing those found to be proper parties in interest is not to be the subject of consideration. It is not in issue.

In his closing argument, Attorney John S. White, representing the heirs, made the following statement to the jury:

"We have never claimed to you at any time that the heirs [are] out to have this woman's estate. Haven't brought any witnesses here to tell you that. Now I am sure that it must puzzle Mr. and Mrs. Rogoski when they try to figure out what I am doing here. Now, understanding that we can not, the heirs can not obtain any more out of this lawsuit for there are six prior wills that all disinherit the heirs. But remember this, *the heirs can get something out of this case. It won't buy a Cadillac automobile and it won't take them to London to Bar meetings, but they can get justice out of this case.* It is something that you can't get with money. I think the position of the heirs, as I said right from the outset, the heirs have a right to contest this case if for no other reason than to see that justice is done, and because there is a principle involved in this case." (Emphasis supplied.)

The attorneys of record in this case are officers of the court performing their professional obligation and comments as to what their clients "can (or can not) get out of it" are highly improper.

This will contest is on no different legal and factual basis than any other in our past jurisprudence and we caution court and counsel if the case is retried to confine the testimony to the issues:

(1) The well-defined, well-recognized test of the testatrix' competency to execute the testamentary instrument at the time she executed it;

(2) The equally well-defined and well-recognized issue of the exercise of fraud or undue influence in the execution thereof, including any presumption created by the fact that proponent was deceased's attorney and the fact that he drew the instrument here involved as such.

The order denying a new trial is vacated and set aside and the case is remanded for further proceedings. Proponent may have costs.

DETHMERS, KELLY, and SMITH, JJ., concurred with O'HARA, J.

SOURIS, J. (*concurring in reversal and remand*). Reluctantly, I join my Brother O'HARA's conclusion that a new trial must be ordered in this case. As I read the record there is ample evidence to sustain the jury's verdict either on the basis that testatrix lacked testamentary capacity or on the basis of fraud and undue influence. Yet, the very factors which prompt Justice O'HARA to characterize this trial as "overemotionalized and underdisciplined" persuade me that neither proponent nor contestants were accorded the fair trial due them and which it is our obligation, as it is also the trial judge's, to provide. On the authority currently appearing in GCR 1963, 865.1(7), I would reverse and remand for new trial.

Upon retrial of this case, it is to be hoped that prejudicially erroneous evidence will be challenged promptly by appropriate objection followed by a motion to strike whenever necessary to protect the

parties' respective interests.[1] Whenever such objection or motion is made, it is the judge's duty to rule unequivocally thereon and to instruct the jury to disregard evidence given which is ordered stricken. Too frequently in the trial reviewed grossly prejudicial evidence was admitted without so much as an objection and too frequently when an objection was made the court failed to rule directly thereon but, instead, ordered the examiner to "proceed".

There is also demonstrated in this case an apparently growing practice of reliance upon what is called in this record a "continuing objection" by which is meant an objection is deemed taken whenever objectionable evidence is offered without need to express such objection for a timely ruling on the record. However useful, and perhaps unobjectionable, such practice may be when restricted to a clearly identifiable and brief line of inquiry as to which an objection is made, argued, and disposed of by ruling, it should not be permitted in other circumstances.

While one of contestants' claims was that the will and codicils were the product of proponent's undue influence over testatrix, contestants did not request, and the trial judge did not submit to the jury, an instruction on the presumption of undue influence which arises in this case by virtue of the fiduciary relationship existing between proponent and testatrix, proponent having been testatrix' lawyer, and having, in fact, drafted the proposed will and its codicils by which he and his wife were named principal beneficiaries of testatrix' estate. We have very recently reviewed the presumption of undue

---

[1] *Metropolitan Life Insurance Co.* v. *Ethier* (1876), 34 Mich 277, 278 (COOLEY, C. J.); *Brown* v. *Barnes* (1878), 39 Mich 211, 214 (33 Am Rep 375); *Baumier* v. *Antiau* (1890), 79 Mich 509, 516; *Weiser* v. *Welch* (1897), 112 Mich 134, 137; *In re Paquin's Estate* (1950), 328 Mich 293, 304, 305; *In re Kanera's Estate* (1952), 334 Mich 461, 475, 476.

influence which arises in such cases when a testator favors in his will a person who is in a confidential and fiduciary relation with him. See *In re Wood Estate* (1965), 374 Mich 278 (5 ALR3d 1). When the fiduciary so benefited, directly or indirectly, happens to be a lawyer-scrivener of the challenged testament, the burden of overcoming the presumption quite obviously is substantially greater than had an independent and disinterested person prepared the testamentary instruments. Indeed, this Court almost 60 years ago bluntly warned the profession against such conduct, in *Abrey* v. *Duffield* (1907), 149 Mich 248, at 259:

"By statute, a bequest to a subscribing witness, necessary for proving the will, is declared absolutely void (CL 1897, § 9268),[2] and this, though the subscribing witness may be and generally is ignorant of the contents of the will. Although there is no statute to invalidate a bequest to a scrivener, the reasons are, at least, as strong for such a statute as in the case of the subscribing witness. I believe it to be generally recognized by the profession as contrary to the spirit of its code of ethics for a lawyer to draft a will making dispositions of property in his favor, and this Court has held that such dispositions are properly looked upon with suspicion. *Dudley* v. *Gates,* 124 Mich 440."

Reversed and remanded. Proponent may have costs.

T. M. KAVANAGH, C. J., and BLACK, J., concurred with SOURIS, J.

BLACK, J. *(concurring in remand).* Refer back to my dissent, *In re Powers Estate,* 362 Mich 222,

---

[2] See, currently, CL 1948, § 702.7 (Stat Ann 1962 Rev § 27.3178 [77]).—REPORTER.

235–241. The initial paragraph of that dissent fore-told what has so far ensued:

"I know of no better way to legalize the Jarndyced mulct of a testator's fat estate than to lay down an unqualified rule that his collaterally distant heirs, all of whom have been previously and steadily disinherited by a series of produced, proven, and fully residuary testaments, are eligible as contestants of what purports to be his latest will."

Now that this first will contest has gone on to one trial measuring eight weeks, and now that it must go back for another, it seems to me that what remains of our 1961 majority should examine again its holding (362 Mich 222–234); a holding which has permitted these collaterally distant and six-times previously disinherited relatives to remain in the contest as intruder contestants and record clutterers.

During his jury argument counsel for such relatives unreservedly conceded that his clients as contestants could obtain nothing in view of the "six prior wills that all disinherit the heirs." (See full quotation in Justice O'HARA's opinion.) Does not some Brother, one at very least, perceive at long last a potent reason why this contest took so long to try? Is not some other Brother convinced, just by the bills against this estate (for counsel fees and litigatory expenses) which have already been approved, that something (especially when it is within this Court's power) should be done to assure that retrial of this first contest should be confined to the sole issue, that is, the issue made by the petition for probate of will and the prosecutor's notice of contest?*

The contest raging over this estate, considering its monetary size and the involvement of charitable

---

* The petition for probate and notice of contest by those eligible to contest frame the triable issue. *In re Reid's Estate*, 248 Mich 360.

bequests as made in the immediately preceding testament, is due in the absence of immediately needful superintendence to reflect odiously on Michigan's "one court of justice" (of which our Court is the responsible head; Const 1963, art 6, § 1). To meet the situation there should be added, to our mandate of reversal, a direction that the circuit court enter an order striking from the record the notice of contest these collateral relatives have filed.

ADAMS, J., took no part in the decision of this case.