# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Estate of REBECCA L. CLEMENCE
REVOCABLE TRUST.

---

KIRK F. CLEMENCE, CAROL C. CONTE, and
MICHELLE M. BONZA,

        Petitioners-Appellants,

v

KATHERINE R. CLEMENCE,

        Respondent-Appellee.

UNPUBLISHED
October 31, 2017

No. 332099
Wayne Probate Court
LC No. 14-798903-TV

---

Before: FORT HOOD, P.J., and GLEICHER and SWARTZLE, JJ.

PER CURIAM.

Rebecca Clemence had four children, but in 2005 amended her trust to give 70% of her estate to only one. Following her 2013 death, Rebecca's other children filed a petition to challenge the validity of the trust, arguing that their mother suffered from dementia in 2005 and lacked testamentary capacity. After sending petitioners on a futile quest for medical records and without holding an evidentiary hearing or trial, the probate court ordered the disbursement of Rebecca's estate as provided in the trust. The probate court improperly denied petitioners their day in court where respondent had not sought summary dismissal of their claims. We vacate the court's order and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

This appeal arises out of a dispute between Rebecca's four children, Kirk, Lisa, Melissa and Katherine, regarding the distribution of Rebecca's estate.[1] Rebecca passed away on October 18, 2013. Eight years earlier, following the death of her husband, Rebecca updated her trust and will. The new estate plan gave Rebecca's home to Katherine. Rebecca bequeathed 70% of her

---

[1] Petitioner Carol Conte is referred to as Lisa throughout the record and Michelle Bonza as Melissa.

-1-

remaining property to Katherine and 10% each to her other three children. Rebecca also named Katherine as her successor trustee and personal representative. Katherine knew of Rebecca's new plans but elected not to tell her siblings. Petitioners claim that Rebecca also did not tell them and they did not learn of the new split until several months after Rebecca's death.

On July 11, 2014, Kirk, Lisa and Melissa filed a petition in the probate court seeking to remove Katherine as trustee, accusing Katherine of violating her fiduciary duty as trustee, and challenging the validity of the trust based on Rebecca's health at the time of amendment. Petitioners also sought an accounting. They contended that Rebecca "was[] exhibiting signs of dementia and memory loss" at the time of their father's death and that Katherine isolated Rebecca from petitioners in order to convince her to change her estate plan.

In the months that followed, petitioners accused Katherine of withholding information about the estate's assets and their mother's medical condition. In relation to Rebecca's health, on October 23, 2014, Katherine revealed the names of several of Rebecca's doctors. Still petitioners believed that Katherine was withholding information. Katherine's claims of ignorance regarding the names of Rebecca's physicians or the reasons for her medical visits during her two-day deposition in the spring of 2015 supported petitioners' concerns.

Katherine had lived with Rebecca since 2005 and was in the best position to know details of Rebecca's health situation. Katherine admitted that she drove her mother to her doctor appointments. Yet Katherine expressed ignorance of the medications Rebecca had been prescribed—"I suspect she was taking medications . . . but I don't know what they were." Katherine claimed not to know whether Rebecca suffered from high blood pressure, high cholesterol, anxiety, or depression. Katherine described that Rebecca used a wheelchair after 2008 due to weakness in her legs, but asserted that Rebecca could have driven and walked if she chose to. Katherine acknowledged that Rebecca had fallen in the past due to the weakness in her legs and had once broken her pinky finger. But when asked if Rebecca had ever sustained facial bruises during a fall, Katherine claimed that she could not recall. Rebecca's death certificate listed three causes of death: pulmonary embolism, "dementia greater than two years," and malnutrition. Katherine vehemently denied that Rebecca had suffered from dementia for any extended period. Rebecca's "memory was sharp" "even up through her final days," according to Katherine.

Katherine's testimony regarding her mother's sharp mental acuity did not conform to the realities of Rebecca's financial affairs. Katherine asserted that her mother handled her own legal and business affairs and paid her own bills with little or no help until just before her death. Yet, while Rebecca was living with Katherine in Katherine's condominium between 2005 and 2009, Rebecca forgot to pay her homeowner's insurance premiums for her Livonia residence. As a result, she had no coverage when a frozen pipe burst. Rebecca did not pay property taxes on Florida real estate previously held by her late husband, leading to a tax foreclosure. Katherine had power of attorney over Rebecca at the time and a lawsuit was initiated against both women

to quiet title.[2]   Katherine signed all timesheets for Rebecca's home healthcare aides despite claiming that Rebecca did not need assistance and only companionship.   And when *Rebecca* allegedly decided to create her own company to employ her aides based on the advice of her accountant, Katherine was the one who signed all incorporation documents.

Ultimately, petitioners filed a motion to compel Katherine to produce additional information regarding Rebecca's health.  The probate court then ordered petitioners to subpoena all of Rebecca's known doctors in an attempt to ascertain whether Rebecca was incapacitated due to dementia in August 2005.  The court also specifically ordered petitioners to subpoena the records of Rebecca's primary care physician, Dr. Peggy Cheng, "from June 1, 2004 through December 31, 2005."   By that point, 10 years had passed since Rebecca had amended her estate plan.  No one acknowledged on the record that medical providers are only required to keep patient records for seven years.  See MCL 333.16213.  On June 26, 2015, Dr. Cheng responded, "This is to inform you we have no records for the dates specified in the subpoena."  Petitioners attempted to clarify whether Dr. Cheng was Rebecca's doctor at the relevant time but Rebecca had not come into the office, whether Dr. Cheng was Rebecca's doctor at the relevant time but had not kept records that far back, or whether Dr. Cheng meant to convey that she was not Rebecca's doctor in 2004 and 2005.  After an additional order from the court, Dr. Cheng finally answered "that she didn't have any records at all during the timeframe," which everyone took to mean that Dr. Cheng had not kept any patient records that far back in time.

Petitioners then sought an order compelling Katherine to produce information regarding Rebecca's health insurance providers.  Katherine indicated that Rebecca received Medicare and was insured by Blue Cross/Blue Shield.  Petitioners again hit a dead end as Blue Cross/Blue Shield indicated that it possessed no records earlier than 2008 and Medicare indicated that the requested records were not available.

From the beginning of the case, petitioners had claimed that they could testify to their personal knowledge regarding Rebecca's condition.  Petitioners' next step was to submit affidavits describing their perception of Rebecca's capacity.  Each described that Rebecca had been diagnosed with "severe vascular dementia" in March 2008, severely limiting her physical and mental condition.  This diagnosis was not sudden, but represented the culmination of many years of declining health.  In August 2007, Rebecca suffered a series of mini-strokes as a result of skipping her blood pressure medication.  Rebecca had not driven since 1997 because it "made her nervous," and she had a long history of mental health issues, including anxiety, depression and obsessive compulsive disorder.[3]   Between their father's June 2005 death and her 2008 dementia diagnosis, petitioners swore that their mother repeatedly forgot that her husband had passed and would refuse to "start an activity" until he returned home.  And once while Rebecca

---

[2] Despite that an attorney filed an answer in Katherine's name, Katherine denied knowledge of the suit.

[3] Unfortunately, Rebecca's treating psychiatrist passed away several years before this suit was initiated.

resided in Katherine's home, neighbors found her wandering the neighborhood looking for her husband and children.

On December 1, 2015, the probate court determined to take out of order Katherine's petition to disburse the remainder of the trust assets, essentially closing the case. The court set out this course despite that Katherine had not filed a motion to dispose of the claims petitioners raised in their petition. Noting that "nothing has come of" petitioners' discovery attempts, the court found, "no additional medical information is appropriate at this time. It's time to close it down." Petitioners' counsel interjected, "this is essentially a Summary Disposition Motion." The court responded:

> *The Court.* And you have your right, I mean you have had more than ample opportunity. For you to try to now imply that it's being treated like a Summary Disposition, when you were given multiple opportunities to produce one iota of evidence to support your clients' claim of something that happened, so many years ago, which is always-

> *[Petitioners' Counsel].* - - Isn't my clients' testimony evidence, your Honor?

> *The Court.* Okay. So what I'm going to do now, is grant the Motion to Finalize the Disbursements. We've been over and over, nothing has been presented. I think it's too little, too late. I know you look confused, but you understand the process of appeal and you have that right.

> I find no merit, in your clients' position at all. I've given them every opportunity to present anything, that at the time the changes were made, there was any medical documentation to support severe enough impairment, to preclude her from having the capacity to make the changes that she made.

> * * *

> *[Petitioners' Counsel].* And then with regard to the complaint filed on behalf of my clients, those claims continue on?

> *The Court.* I don't know what complaints you're talking about.

> *[Petitioners' Counsel].* The petition, so the allegations in the petition that either A: the Decedent did not have the proper –

> *The Court.* Well the motion is being granted, his motion is being granted so obviously all of those are being dismissed.

Petitioners subsequently filed a motion for reconsideration, which the probate court denied. They then appealed the court's ruling.

II. ANALYSIS

Petitioners' claims to remove Katherine as trustee, challenging the validity of Rebecca's revocable trust, and alleging breach of fiduciary duty were brought pursuant to the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* MCL 700.7604(1) of the chapter pertaining to trusts permits a person to contest the validity of a revocable trust.

Petitioners challenged Rebecca's capacity to execute the revocable trust on August 29, 2005. MCL 700.7402(1)(a) provides that a trust settlor must have sufficient mental "capacity to create a trust." MCL 700.7601 provides that a person creating a trust must have the capacity "required to make a will." MCL 700.2501, in turn, sets forth the capacity requirements for an individual executing a will as follows:

> (1) An individual 18 years of age or older who has sufficient mental capacity may make a will.
>
> (2) An individual has sufficient mental capacity to make a will if all of the following requirements are met:
>
>> (a) The individual has the ability to understand that he or she is providing for the disposition of his or her property after death.
>>
>> (b) The individual has the ability to know the nature and extent of his or her property.
>>
>> (c) The individual knows the natural objects of his or her bounty.
>>
>> (d) The individual has the ability to understand in a reasonable manner the general nature and effect of his or her act in signing the will.

Capacity is measured "as of the time of the execution of the instrument." *In re Powers Estate*, 375 Mich 150, 158; 134 NW2d 148 (1963). And we must presume that a testator was competent and capable to execute a will. *In re Mardigan Estate*, 312 Mich App 553, 565; 879 NW2d 313 (2015).

A trust will also be held invalid if "its creation was induced by fraud, duress, or undue influence." MCL 700.7406. In *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684 699; 880 NW2d 269 (2015), this Court set forth the following applicable principles of law regarding undue influence:

> The party alleging undue influence in the execution of a testamentary instrument must present evidence "that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will." Proof of motive, opportunity, or even the ability to control the grantor is not sufficient to establish undue influence in the absence of affirmative proof that it was exercised. [Citations omitted.]

Undue influence will also be presumed in certain circumstances.

> A presumption of undue influence exists when evidence establishes (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) that the fiduciary or an interest represented by the fiduciary benefits from a transaction, and (3) that the fiduciary had an opportunity to influence the grantor's decision in the transaction. [*Id.* at 700-701.]

The probate court dismissed petitioners' challenges because they had as yet presented no medical evidence regarding Rebecca's mental or physical health. Certainly it would be easier to prove whether Rebecca possessed testamentary capacity or was vulnerable to undue influence if the probate court could review medical records contemporaneous with her estate plan amendment. But such records are not the only method of proof. A lay witness may place his or her opinions into evidence as long as they "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701. And our Supreme Court has specifically found lay opinion testimony admissible to establish a decedent's testamentary capacity. See *In re Moxon's Estate*, 234 Mich 170, 173-173; 207 NW 924 (1926) (holding that a lay witness "who [has] had the opportunity to observe and talk to [the decedent]" may form "impressions" of the decedent's testamentary capacity and may cite examples for the factfinder's consideration); *In re Estate of Powers*, 375 Mich 150, 175; 134 NW2d 148 (1965) ("Lay witnesses, before they may express a testimonial opinion as to testamentary capacity must testify first to facts inconsistent with sanity.").

Petitioners had such evidence available. They each provided an affidavit generally describing their perceptions of their mother's competency since the June 2005 passing of their father. Petitioners all claimed that their mother's mental awareness began to decline even before their father's death, but greatly diminished as a result of the trauma of losing her husband. Petitioners themselves secured evidence contradicting their allegations; attorney Kenneth Gold testified during his deposition, which was noticed by petitioners, that he prepared Rebecca's amended trust documents and that he would not have done so if he perceived Rebecca to be incompetent. The conflicting evidence created a question of fact to be resolved before the trust assets were disbursed and the case closed. The court took no notice of this contest, refusing to look beyond petitioners' inability to secure medical documentation.

The probate court also took no consideration of petitioners' contention that Katherine unduly influenced her mother into changing her estate division while she was vulnerable due to the recent loss of her husband. The court noted on the record that it found Katherine's repeated claims of ignorance to be incredible. Katherine lived with her mother continually from her father's June 2005 death until her mother's October 2013 passing. Katherine obstinately denied being her mother's primary caregiver despite this arrangement, and despite that all documentation regarding the initiation of her home healthcare services and the management of Rebecca's aides was signed by Katherine. And at some point, Katherine was named Rebecca's power of attorney, giving her some level of financial control.

This record evidence created a rebuttable presumption of undue influence. See *Bill & Dena Brown Trust*, 312 Mich App at 701. Specifically, Katherine served as a fiduciary for mother, or at least was in a position of trust. She benefitted from the amended trust by being

granted her mother's house and 70% of all remaining property. Katherine had the opportunity to influence her mother's decisions from June through August 2005, as the two women lived alone together. The probate court was required to address this issue on some level before ordering the winding down of the trust.

Regardless of the state of the evidence, the probate court did not follow proper procedure, dismissing this matter out of hand and without motion from Katherine. Katherine was represented by counsel knowledgeable on the law. Yet Katherine never filed a motion to summarily dismiss petitioners' challenge for lack of evidentiary support. The only remaining conclusion is that the court dismissed the case as some sort of penalty against petitioners. The petitioners never violated a discovery order, however. Petitioners requested the names of Rebecca's doctors and medical insurance provider as ordered. They subpoenaed the doctors who could have relevant information, as well as Blue Cross/Blue Shield and Medicare, but learned that no one had kept records dating back to August 2005. The court never ordered petitioners to do anything more. Petitioners deposed Katherine in a vain attempt to create a more complete picture of Rebecca's medical and financial conditions. Petitioners may have dragged their feet along the way, but not so much as to warrant dismissal without warning.

We vacate the probate court's orders dismissing petitioners' challenges, directing the disbursement of the remaining trust assets, and closing the trust. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle